In re WYNNEFIELD MANOR
ASSOCIATES, L.P.,
Debtor.

Bankruptcy No. 93–13153DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 14, 1993.

John L. Jenkins, Philadelphia, PA, for debtor.

Luis F. Chaves, General Counsel, McLeon, VA, Vincent J. Marriott, Ballard Spahr Andrews & Ingersoll, Local Counsel, Philadelphia, PA, for Freddie Mac.

Frederic Baker, Philadelphia, PA, Asst. U.S. Trustee.

## MEMORANDUM

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Presently before this court in the voluntary Chapter 11 bankruptcy case of WYNNEFIELD MANOR ASSOCIATES, L.P. ("the Debtor") is the Debtor's request that we confirm its Amended Plan of Reorganization ("the Plan") and a Motion ("the Motion") of the Debtor's only secured creditor, the Federal Home Loan Mortgage Corp. ("Freddie Mac"), seeking relief from the automatic stay to proceed to foreclose upon the Debtor's single asset, a 38–unit apartment complex known as Wynnefield Manor Apartments, located at 4927 Wynnefield Avenue, Philadelphia, Pennsylvania 19151 ("the Property"). We find that the Plan is not confirmable over Freddie Mac's rejecting votes and Objections because it violates the absolute priority rule and because its pronounced negative amortization feature precludes our finding that it is "fair" and "equitable" to Freddie Mac. Since minor amendments would not cure these defects, we will proceed to not only deny confirmation, but also proceed to grant the Motion as well.

### B. PERTINENT PROCEDURAL AND FACTUAL HISTORY

The Debtor, a limited partnership of which Edward Portnof, who testified at trial, is apparently the managing general partner, filed the underlying voluntary Chapter 11 bankruptcy case on May 25, 1993. Freddie Mac holds a perfected first mortgage lien on, and an assignment of leases, rents, and profits of, the Property. Freddie Mac's secured claim is evidenced by the Multifamily Note ("the Note"), dated November 12, 1985, in the original principal amount of $890,000.

According to Freddie Mac, and not seriously contested by the Debtor, its claim as of the filing date was $1,001,431.91. Freddie Mac's appraiser, Robert Wright, testified that, as of May 6, 1993, the value of the Property was $670,000. Thus, Freddie Mac asserts that it has a secured claim of $670,000 and an unsecured claim of $331,431.91. The Debtor, per its appraiser, M. Richard Cohen, claims that the value of the Property is but $590,000. If this value were correct, Freddie Mac would have a secured claim of $590,000 and an unsecured claim of $411,431.91. In light of our instant disposition, there is no need for us to determine the value of the Property because the differences are relatively small and the Plan is not confirmable even if we assume that the Debtor's Property value is correct.

Freddie Mac filed the Motion on June 17, 1993. Upon this court's suggestion that it would be likely to reach the same result if the Motion were tried at that early juncture in this case, Freddie Mac agreed to abide from pressing the Motion until we could ascertain whether the Debtor could successfully confirm a Plan. The Debtor, on its part, agreed to file its Plan and Disclosure Statement by September 13, 1993. Per an Order of August 4, 1993, this court conditioned the stay on the Debtor's success in confirming a plan, and carried the Motion through approval of the Disclosure Statement on October 13, 1993, to the confirmation hearing of November 17, 1993. We advised the Debtor to utilize its best efforts to produce a confirmable plan on its first attempt, because we would be likely to grant Freddie Mac's Motion for relief if we denied confirmation. We advised the Debtor of our decisions in *In re Union Meeting Partners*, 160 B.R. 757 (Bankr.E.D.Pa.1993); and *In re River Village Associates*, 24 B.C.D. 1400, 161 B.R. 127 (Bankr.E.D.Pa.1993), which addressed and resolved many issues commonly arising in cases similarly initiated by partnerships owning single realty assets.

After hearings on confirmation and the Motion on November 17, 1993, and a short extension of the initial post-hearing deadlines, the Debtor and Freddie Mac were accorded until December 6, 1993, and Decem-

ber 13, 1993, respectively, to provide post-trial submissions.

In the Plan, the claims of the Debtor's tenants, described by Portnof as earning mainly mid to lower income, for their security deposits comprise Class 2. The Debtor intends to convert the security deposits into advance payments for each tenant's last month's rent. This class accepted the Plan. The issue of whether this treatment impairs this class was decided favorably to the Debtor in *River Village, supra,* 24 B.C.D. at 1404, 161 B.R. at 133–34.

Freddie Mac's allowed secured claim comprises Class 3A. This claim will accrue interest at nine (9%) percent per annum. Beginning on the Plan's effective date, the Debtor will make monthly payments of partial interest due only on this claim for six (6) years. However, these payments are not to exceed the following: (1) $42,000 in years 1 and 2; (2) $43,000 in year 3; (3) $44,000 in year 4; (4) $45,000 in year 5; and (5) $46,000 in year 6. The annual interest of $53,100, per the Debtor's calculation, which is in excess of these aggregate annual limits will be deferred. The Debtor will make a final balloon payment equal to the balance of Freddie Mac's secured claim (including all deferred interest) six years after the Plan's effective date. Because of the limits on interest payments, the Plan proposes negative amortization of Freddie Mac's claim over the entire six-year period. This class, per Freddie Mac, rejected the Plan.

If Freddie Mac had elected to have its entire claim treated as a secured claim pursuant to 11 U.S.C. § 1111(b), its claim would have comprised Class 3B. It did not so elect, and therefore, we need not discuss the proposed treatment of this claim.

Freddie Mac's unsecured deficiency claim comprises Class 4. The Debtor will pay seven and one half (7½%) percent of this claim over ten years, without interest. The Debtor will also give Freddie Mac fifty (50%) percent of any refund which it receives from the City of Philadelphia as a result of a successful tax assessment appeal. This class, again per Freddie Mac, also rejected the Plan.

All other non-insider allowed unsecured claims comprise Class 5. The Debtor will pay seven and one-half (7½%) percent of these claims over ten years, without interest. This class accepted the Plan. In light of our disposition, we need not address an issue to which the parties devote considerable attention, *i.e.,* whether the classification of Freddie Mac's deficiency claim separate from other unsecured claims violated the principles enunciated in *John Hancock Mutual Life Ins. Co. v. Route 37 Business Park Associates,* 987 F.2d 154, 157–61 (3rd Cir.1993). We would probably be inclined to conclude that the classification was not improper, since it was not the sole purpose of this classification scheme to create a class sufficient to satisfy 11 U.S.C. § 1129(a)(10); another impaired class (Class 2) has accepted the Plan.

The allowed unsecured claims of the Debtor's general partners and Coneast Properties, Ltd., a corporation controlled by certain of the Debtor's general partners, comprise Class 6. No payment will be made on these claims until all of the claims in Classes 4 and 5 have been paid pursuant to the Plan. After that time, the Debtor will pay seven and one-half (7½%) percent of these claims over ten years, without interest. If, however, any such claims are less than $100, the Debtor has the option of paying the claims in full within sixty days after the final payment to the Classes 4 and 5. This class accepted the Plan.

The limited and general partnership interests in the Debtor comprise Class 7, which also accepted the Plan. The Plan proposes that the partners will make an aggregate capital contribution of $25,000 in exchange for retention of their partnership interests in the Debtor. The partners offered to execute a "springing guarantee" in favor of Freddie Mac, extending certain limited personal guarantees of the Debtor's obligations to Freddie Mac subject to such guarantees' being reduced to a written agreement acceptable to all parties. Since the terms of these proposed guarantees are hence presently uncertain, we are obliged to give their potential presence little, if any, weight.

Freddie Mac has numerous objections to the Plan, as well as having voted the classes

of which it is a member to reject it. However, we have found that two of those objections will clearly prevent confirmation and, therefore, we will only address those two issues.

## C. DISCUSSION

### 1. THE PLAN VIOLATES THE ABSOLUTE PRIORITY RULE

Freddie Mac argues that the Plan violates the absolute priority rule because the Debtor's partners will retain their interest in the Debtor even though a senior class of creditors (Class 4) has rejected the Plan. The absolute priority rule, which is codified at 11 U.S.C. § 1129(b)(2)(B)(i) and (ii), provides that "a dissenting class of unsecured creditors must be provided for in full before any junior class of unsecured creditors can receive or retain any property under a reorganization plan." See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988); Bonner Mall Partnership v. U.S. Bancorp Mortgage Co., 2 F.3d 899, 909 (9th Cir.1993); In re Custer, 1993 WL 7965, slip op. at *6 (Bankr. E.D.Pa. January 7, 1993); In re Sovereign Group 1985-27, Ltd., 142 B.R. 702, 705 (E.D.Pa.1992); In re Capital Center Equities, 144 B.R. 262, 267-68 (Bankr.E.D.Pa. 1992); In re Harman, 141 B.R. 878, 885 (Bankr.E.D.Pa.1992); In re One Times Square Associates Limited Partnership, 159 B.R. 695, 706-07 (Bankr.S.D.N.Y.1993); In re Miami Center Associates, Ltd., 144 B.R. 937, 941-42 (Bankr.S.D.Fla.1992); In re Woodscape Ltd. Partnership, 134 B.R. 165, 168 (Bankr.D.Md.1991); and In re 222 Liberty Associates, 108 B.R. 971, 983 (Bankr. E.D.Pa.1990).

However, most courts, including this court, have recognized a so-called "new value exception" to the absolute priority rule, which we have described as follows:

> where there is an infusion of new capital by the debtor, or by the principals of the debtor, in exchange for their continued retention of the reorganized debtor's property, most courts have acknowledged that the strictness of the requirements of the [absolute priority rule] may be relaxed. See [In re] Snyder, supra, 967 F.2d [1126,]

at 1128-31 [(7th Cir.1992)]; Sovereign Group, supra, 142 B.R. at 706-08; Capital Center, 144 B.R. at 268 and cases cited therein; and In re Tallahassee Associates, L.P., 132 B.R. 712, 716-17 (Bankr.W.D.Pa. 1991), and cases cited therein. As noted in Capital Center, supra, 144 B.R. at 268, in order to invoke this so-called [new value exception] to the [absolute priority rule], the "'qualifying new value contribution must be (1) necessary to the reorganization; (2) in the form of money or money's worth; and (3) reasonably equivalent to the interest retained,'" quoting Snyder, 967 F.2d at 1131; and citing Sovereign Group, supra, 142 B.R. at 708; Harman, supra, 141 B.R. at 885-87; and 222 Liberty Associates, supra, 108 B.R. at 983-84. Furthermore, the contribution must be substantial and proffered by the Debtor at the outset, i.e., "up front." Capital Center, supra, 144 B.R. at 268; Snyder, supra, 967 F.2d at 1131; and In re Stegall, 85 B.R. 510, 514 (C.D.Ill.1987), aff'd, 865 F.2d 140 (7th Cir.1989).

Custer, supra, slip op. at *6.

In the instant case, the Debtor claims that the Plan satisfies the new value exception because the Debtor's partners are contributing $25,000 of new capital. In the course of the confirmation hearing, the Debtor argued that $25,000, though modest, was an appropriate figure because there was no great need for repairs at the Property and there was no net equity of the Property's value in excess of Freddie Mac's secured claim. Therefore, it contended, the partners were not keeping anything of value by retaining the Property in exchange for their capital contribution, and only a modest addition of new value was sufficient to overcome the force of the absolute priority rule.

■ We hold that the Plan violates the absolute priority rule because the Debtor has failed to prove that its new capital contribution is (1) substantial; (2) proportionate to the interest retained by the Debtor's partners; or (3) necessary to the Debtor's reorganization.

In determining whether a contribution is "substantial," in the context of a small, close-

ly-held debtor-entity, we have examined two factors: (1) whether the proposed payment represents the partner's best efforts; and (2) the amount of the contribution, or the percentage of the return on their claims, projected to creditors. *Capital Center, supra,* 144 B.R. at 269–70. In this case, the Debtor did not prove that the proposed $25,000 contribution represented the partners' best efforts. Based on the testimony of Portnof, it appeared that the partners, who own numerous other real estate holdings, mostly in the vicinity of New York City, were of substantial means and that $25,000 did not necessarily represent their best efforts. Rather, it was all that they were willing to contribute to this particular enterprise.

Assuming that the Debtor's Property value of $590,000 is correct, the $25,000 contribution is very small. It appears that it is true that it is only in light of this payment that the Debtor is able to pay any dividend to unsecured creditors. However, even with this contribution, the Debtor is only paying seven and a half (7½%) percent of its unsecured claims. The payment total of $25,000 is only 6.08% of Freddie Mac's unsecured claim. In *Snyder, supra,* 967 F.2d at 1131–32, the court found that a $30,000 cash contribution, which would result in a dividend of about three (3%) percent to unsecured creditors, was not sufficiently substantial. By way of contrast, in *Capital Center, supra,* 144 B.R. at 270, we determined that, based on the partners' limited financial means, a capital contribution that would result in about a thirty (30%) percent return to unsecured creditors would satisfy the "substantiality" requirement. In the instant case, a thirty (30%) percent return on just Freddie Mac's claim would require a capital contribution in excess of $120,000. Since the Debtor has not proven that the proposed $25,000 contribution represents the partners' best efforts and it only results in dividend of approximately 6.08% on Freddie Mac's unsecured claim, we conclude that this payment does not satisfy the "substantiality" requirement necessary to be met for invocation of the new value exception.

Second, we question whether the partners' proposed contribution is proportionate to the value in the Debtor that they are retaining. With respect to this requirement, this case is factually analogous to *One Times Square, supra;* and *Miami Center, supra,* where the respective courts found that this requirement was wanting. In *One Times Square,* the debtor's sole realty asset was valued at $19,000,000. The debtor's principal secured creditor had a secured claim of $19,000,000 and an unsecured deficiency claim of $11,050,000. The debtor's plan, like the instant Plan, proposed to pay unsecured creditors seven and one half (7½%) percent of their allowed unsecured claims, without interest, over five (5) years. The debtor's plan also proposed that the limited partners would retain their interests in the debtor in exchange for potential capital contributions of approximately $2,397,000.

The court held that the plan violated the absolute priority rule. Its reasoning, 159 B.R. at 708, was as follows:

It appears that only a small portion of the "new value" capital infusion is allocated to satisfy creditors' claims upon confirmation. The new value is to be used primarily to make repairs to [the property] and thereby preserve and enhance the value of the interest to be retained by the contributing principals. Thus, the Plan reserves the upside potential for the Debtor while forcing the Bank to bear all the risk. This Court finds that the proposed capital contribution of the limited partners is not proportionate to the interests which they will retain under the Debtor's Plan of Reorganization. We therefore conclude that the capital infusion fails to meet the requirements of the new value exception (footnote omitted).

In its reasoning pertinent to this prerequisite for invocation of the absolute priority rule, the *One Times Square* court also rejected the argument, invoked by the Debtor near the end of its post-trial Brief, that, since the Property had no equity, the partners are not retaining anything of value in exchange for their capital. The *One Times Square* court explained, 159 B.R. at 708–09, that

the Debtor's argument is a variation of the "no value" theory rejected by the Supreme Court in *Ahlers.* In *Ahlers,* the debtor

argued that the absolute priority rule does not apply where the property which the junior interest holder wishes to retain has no value to the senior unsecured creditors. *Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). The debtor maintained that "the creditors are deprived of nothing if such a so-called 'interest' continues in the possession of the reorganized debtor." *Ahlers,* 485 U.S. at 207, 108 S.Ct. at 969. "Even where debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains 'property' ... Whether the value is 'present or prospective, for dividends or only for purposes of control' a retained equity interest is a property interest to which the creditor's [are] entitled ... before the stockholder [can] retain it for any purpose whatever." *Ahlers,* 485 U.S. at 208, 108 S.Ct. at 969, *citing Northern Pacific R. Co. v. Boyd,* 228 U.S. [482] at 508, 33 S.Ct. [554] at 561 [57 L.Ed. 931 (1913)].

Like the *One Times Square* court, we reject the Debtor's argument that it satisfies the "proportionate contribution" requirement for invocation of the new value exception simply because there is no equity in the Property. We are obliged to consider that the Property has an upside potential as a going concern. If the Debtor's partners wish to savor the benefits of this upside potential, the prospect of which is their only apparent motivation for filing this case and proposing the Plan, then they are obliged to make some reasonable compensation in the nature of protection to the secured creditor in exchange for that creditor's bearing the risk of failure of this upside potential to materialize. *See* K. Kruis, *A Framework for Application of the New Value Exception,* 21 CALIF.BANKR.J. 199, 216–25 (1993).

In *Miami Center,* the debtor's sole asset, a hotel, was valued at $18,550,000. The debtor's principal secured creditor was owed in excess of $38,000,000 and elected to have its entire claim treated as a secured claim pursuant to 11 U.S.C. § 1111(b). The debtor's plan proposed that the limited partners would retain their interest in the debtor in exchange for capital contributions of $6,000,000 over three years, $2,000,000 of which

would be paid at confirmation. The court held that, since the secured creditor was being paid over ten years, it ran the risk of the project's failure with no upside potential. The partners retained the upside potential, because the new value was not being used to pay the secured creditor's claim, but was being used to refurbish the hotel. Further, in return for $2,000,000 at confirmation, the partners were receiving an asset worth $18,550,000. Thus, the court held that the new value was not reasonably equivalent to the equity retained.

In *One Times Square* and *Miami Center,* the proposed potential capital contributions were both in excess of $2 million and were approximately 12.6% and 10.8%, respectively, of the properties' values. In the case at bar, the partners would be contributing $25,000 in exchange for Property that is valued, at a minimum, at $590,000. Thus, the proposed equity contribution is not only a much smaller amount, but is a much smaller percentage of value, *i.e.,* approximately 4.2% of the Property's value, than the contributions at issue in those unsuccessful cases. Based on the foregoing cases, this contribution is not reasonably equivalent to the value retained.

Finally, the Debtor has not proven that the proposed capital contribution is necessary. Portnof did testify that some minor repairs are necessary to the potentially attractive but aging (vintage 1928) structures on site, such as fixing windows and replacing stoves. However, Portnof also testified that more extensive repairs had not yielded higher rents, and that therefore he had concluded that expensive repairs were not cost-effective to make and had been discontinued. Thus, there was no evidence that the $25,000 contribution was needed for the repairs or otherwise in the reorganization process. The only apparent use of the funds was to make a nominal payment to unsecured creditors. In sum, it appears that the partners were proposing a small contribution, with no evidence of its necessity, merely in order to argue that they could thereby satisfy the absolute priority rule. *Compare In re 222 Liberty Associates,* 108 B.R. 971, 985 (Bankr.E.D.Pa.1990) (purchasing partner proposed a contribution

of $1.2 million to repairs of a building badly in need of renovations).

In gauging the necessity of the contribution, the court's inquiry should focus on four factors: the need for the funds, the use of the funds, the adequacy of the fund, and the lack of capital from traditional financial market.

K. Kruis, *supra*, 21 CALIF.BANKR.J. at 207.

It appears likely that the Debtor could satisfy the fourth Kruis factor. The record clearly suggests that it would not be able to obtain any credit from traditional lenders to fund the Plan, since there is no market for loans on real estate which has no remaining equity. However, the other three factors have not been established. The use to which the funds will be put, as is noted above, is not clear. Therefore, the need for the funds is equally murky and insufficiently established. As was noted in our discussion of the substantiality of the partners' contribution, the small amount to be contributed is probably not adequate for any purpose. We therefore conclude that the Debtor has failed to meet its burden of establishing that the proposed contribution is necessary for the Debtor's reorganization.

For the foregoing reasons, the Plan fails to meet the standards for invocation of the new value exception to the absolute priority rule; it violates that rule; and, therefore, it cannot be confirmed.

2. *THE NEGATIVE AMORTIZATION FEATURE OF THE PLAN FAILS TO SATISFY MOST OF THE FACTORS WHICH MUST BE WEIGHED IN DETERMINING WHETHER A PLAN IS "FAIR AND EQUITABLE" IN THE PRESENCE OF SUCH A FEATURE*

Freddie Mac also successfully argues that the Plan is not fair and equitable because it proposes negative amortization of its allowed secured claim over the Plan's entire six-year period. It is undisputed that the Plan provides for negative amortization of Freddie Mac's secured claim for this period, because, as explained at page 55 *supra*, the maximum interest that can be paid in any one year under the Plan is less than the amount of interest that is due during that time.

Although negative amortization is not *per se* impermissible, "courts have been wary of plans which contemplate negative amortization and have actually permitted its use in rather few instances." *In re 641 Associates, Ltd.*, 140 B.R. 619, 630 (Bankr.E.D.Pa.1992). In that case, *id.*, at 630–31, this court utilized the following factors in determining whether negative amortization was appropriate, which we adopted from *Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174, 1178 (9th Cir.1992); and *In re Apple Tree Partners, L.P.*, 131 B.R. 380, 398 (Bankr. W.D.Tenn.1991):

1. Does the plan offer a market rate of interest and present value of the deferred payments;

2. Is the amount and length of the proposed deferral reasonable;

3. Is the ratio of debt to value satisfactory throughout the plan;

4. Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;

5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;

6. Are the risks unduly shifted to the creditor;

7. Are the risks borne by one secured creditor or class of secured creditors;

8. Does the plan preclude the secured creditor's foreclosure;

9. Did the original loan terms provide for negative amortization; and

10. Are there adequate safeguards to protect the secured creditor against plan failure.

In this case, the Debtor appears to have satisfied the first and fourth factors listed above. The first factor examines whether the interest rate proposed is a market rate which provides the creditor with the present value of its claim. The proposed interest rate under the Plan is nine (9%) percent. Guided by our recent decision in *River Village, supra*, 24 B.C.D. at 1405–08, 161 B.R. at 134–40 we believe that, despite

the presence of *General Motors Acceptance Corp. v. Jones,* 999 F.2d 63 (3rd Cir.1993), an appropriate interest rate payable to Freddie Mac on its claim would be the risk-free rate (*i.e.,* the treasury bill rate or prime rate for a term equal to the proposed payout period), plus a risk premium. The Debtor testified that, on the day of the confirmation hearing, the six year treasury bill rate, applicable for the duration of the Plan, was five and one-tenth (5⅒%) percent. We believe that a risk premium of three (3%) percent is appropriate. *Id.,* 24 B.C.D. at 1408, 161 B.R. at 139. Since the Plan proposes an interest rate of nine (9%) percent, which is in excess of eight and one-tenth (8–⅒th%) percent (*i.e.,* the risk free rate plus the risk premium), the Plan offers a rate above the market rate, and provides sufficient present value of the deferred payments to Freddie Mac.

■ The fourth factor examines the reasonableness of the Debtor's projections and the feasibility of the Plan. The Debtor's principal proposal for change in its management of the Property was to attempt to increase the number of units participating in the federal Section 8 rent subsidy program. This is not only a reasonable goal from an economic point of view, but it is socially responsible and commendable as well. The feasible requirement, not being rigorous, *see In re Orfa Corp. of Philadelphia,* 129 B.R. 404, 410–11 (Bankr.E.D.Pa.1991); *In re Temple Zion,* 125 B.R. 910, 914–145 (Bankr. E.D.Pa.1991); and *222 Liberty Associates, supra,* 108 B.R. at 985–86, thus appears to have been satisfied.

■ The Debtor has, however, failed to satisfy most or all of the other important factors which must be considered in determining whether to permit a debtor to successfully posit a plan containing negative amortization. The amount and length of the proposed deferral is six years, which is three times more than the two years we considered acceptable in *641 Associates,* 140 B.R. at 632. *Compare In re Spanish Lake Associates,* 92 B.R. 875, 876–77, 879 (Bankr.E.D.Mo.1988) (seven-year period of negative amortization deemed excessive).

The ratio of debt to value is unsatisfactory throughout the Plan, since there is currently no equity in the Property and unlikely to be any in the foreseeable future. The amount of debt will increase during the Plan as a result of the negative amortization.

With respect to the fifth factor, although the Property has an unusual and appealing outer design and is located in a traditionally upscale and attractive area of Philadelphia, proximate to a golf course and Fairmount Park, the neighborhood is in decline, and the buildings are over 60 years old and do not approach a modern appearance. Nor have they been, in any sense of the word, "restored." Since the Debtor does not intend to make any significant improvements to the Property and there is evidence that the Property's value has decreased very dramatically, even relative to other properties in the market, from the $1.4 million purchase price in 1988 to $590,000. Thus, at best, we can only assume that the Property's value is no better than stable. *Compare 641 Associates, supra,* 140 B.R. at 632 (debtor found to have modest equity in an attractively-restored historic building located in a neighborhood in Manhattan which this court found "apt to change economically for the better").

As we noted in *641 Associates,* 140 B.R. at 631, factors 6, 8, and 10 are somewhat repetitious, and address the issue of "the remedies available to the secured creditor in the event that developments projected by the plan do not materialize." These issues are "crucial." *Id.* at 632.

> If the Plan allows a secured creditor to obtain swift redress in the event of dismal performance by a debtor, as opposed to locking in a secured creditor without adequate returns on its security or redress in the event of default for an extended period, a court should properly feel more comfortable about allowing a negative amortization feature in a plan.

*Id.* at 631.

The instant Plan fails badly in these respects. The Plan contains nothing which protects Freddie Mac in the event that it fails. The Debtor states that its partners will execute a "springing guaranty" in favor of Freddie Mac to protect its interests, but it has not set forth even an outline of the terms

and conditions of this alleged guaranty. Therefore, we can give its prospect virtually no weight. Thus, if property values continue to fall and the debt-to-value ration of the Property continues to decrease; if the attempt to instill more Section 8 tenants fails due to lack of government funding or difficulties meeting the Building Code requirements for Section 8 participation; or if the shrinking ability of the Property's present and prospective tenant-body to pay rent does not abate, Freddie Mac would be powerless to act and its debt would be increased without remedy as long as the. Debtor made the requisite annual interest payments. Thus, a considerable portion of the very substantial risks of reorganization are unfairly thrust upon Freddie Mac.

The risks are not, as in *641 Associates,* 140 B.R. at 632, apportioned with other secured creditors who have accepted the Plan. It is not contended that the original loan documents included a negative amortization feature. The seventh and ninth factors therefore weigh against the Debtor.

Given the foregoing analysis, we have little choice except to conclude that the negative amortization feature of the Plan renders it incapable of satisfying the "fair and equitable" requirement of § 1129(b)(1).

### 3. *DENIAL OF CONFIRMATION AND GRANTING OF FREDDIE MAC'S § 362(d) MOTION IS APPROPRIATE*

■ We have therefore concluded that, for two separate reasons, the Plan is not confirmable. It does not appear to us that either of these defects are readily correctable. *Compare 641 Associates, supra,* 140 B.R. at 633 (debtor was obliged to make only a slight increase in the interest rate payable to the secured creditor and to make some other slight adjustment in light of dismissal of its lender liability action against the creditor to render it confirmable).

The Debtor has been thus given its "one clear chance to confirm a plan," *River Village, supra,* 24 B.C.D. at 1410, 161 B.R. at 142, with the benefit of our treatment of related issues in *River Village* and *Union Meeting Partners, supra,* to guide it. Freddie Mac has patiently abided the outcome as the confirmation process for almost six months since it filed the Motion. The Debtor has failed in this attempt. Freddie Mac is now entitled to relief.

In light of these circumstances, we do not believe that it would be equitable or fruitful to give the Debtor any further opportunities to prepare a plan, prior to granting Freddie Mac's Motion. The requirements of 11 U.S.C. § 362(d)(2) are met, because the Debtor lacks equity in the Property and has not been able to achieve a successful reorganization, although given a full opportunity to do so. Since no confirmable plan has been proposed and Freddie Mac's interest in the Property has continued to erode, its interest in the Property is not adequately protected, *see In re Franklin Pembroke Venture II,* 105 B.R. 276, 278 (Bankr.E.D.Pa.1989), and cause for relief, pursuant to 11 U.S.C. § 362(d)(1), is proven. This court will therefore enter an Order which both denies confirmation of the Plan and grants Freddie Mac's Motion.

### D. MOTION

An appropriate Order, so providing, follows.

### ORDER

AND NOW, this 14th day of December, 1993, after a hearing of November 17, 1993, to consider confirmation of the Debtor's Amended Plan of Reorganization ("the Plan"), to which date we also carried a Motion ("the Motion") of Federal Home Loan Mortgage Corp. ("Freddie Mac") seeking relief from the automatic stay with reference to the Debtor's real property located at 4927 Wynnefield Avenue, Philadelphia, Pennsylvania 19151, upon consideration of the parties' pre-hearing and post-hearing submissions, it is ORDERED AND DECREED as follows:

1. Confirmation of the Plan is DENIED.

2. The Motion is GRANTED. Freddie Mac is given relief from the automatic stay, pursuant to 11 U.S.C. §§ 362(d)(1) and (d)(2), to proceed to exercise its applicable nonbankruptcy law rights against the Debtor with reference to the Property.

3. A status hearing to determine the future course of this case is scheduled on

WEDNESDAY, JANUARY 5, 1994, AT 9:30 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.