**In re UNITED CHEMICAL
TECHNOLOGIES,
INC., Debtor.**

**Bankruptcy No. 95–18221DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

June 5, 1996.

Mary F. Walrath, Walrath & Coolidge, Philadelphia, PA, for Debtor.

Steven Usdin, Philadelphia, PA, for Creditors' Committee.

Robert A. Kargen, Lesser & Kaplin, P.C., Blue Bell, PA, for Corestates Bank.

Joseph A. Toregrossa, Morgan, Lewis & Bockius, Philadelphia, PA, for Huls America, Inc.

Charles Samsel, Begley, Carlin & Mandio, Langhorne, PA, for Bucks County Industrial Development Corp.

Douglas H. Riblet, Morrisville, PA, for Remac USA, Inc.

Albert George Bixler, Philadelphia, PA, for Northeast Environmental Services, Inc.

Stanley Lebofsky, Weinstein, Leonard & Lebofsky, Philadelphia, PA, for Young Adjustment Company.

Leslie B. Gaynus, Philadelphia, PA, for PA. Dept. of Labor & Industry.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before this court are Objections ("the Objections") of Corestates Bank ("the Bank") to the Amended Plan of Reorganization ("the Plan") filed by UNITED CHEMICAL TECHNOLOGIES, INC. ("the Debtor") and a Motion of the Bank for relief from the automatic stay to foreclose on its security interests against the Debtor ("the Motion"). Finding that the feasibility and 11 U.S.C. § 1129(b) issues principally argued by the Bank have previously been decided, in prior opinions of this court, in favor of other debtors with less favorable prospects than the instant Debtor, and that none of the technical Objections raised by the Bank have any merit, the Objections will be overruled. Confirmation of the Plan, however, must await what appears to be the inevitable approval of a settlement of the objections of Remac USA, Inc. ("Remac") to the Plan. We will schedule a hearing on the Debtor's motion to approve the settlement with Remac on June 12, 1996, with other motions carried over pending this decision. In view of the imminent confirmation of the Plan, the Motion will be denied.

### B. PROCEDURAL AND FACTUAL HISTORY

The relevant history of the Debtor is well-stated by the Bank in its post-trial Brief, and the Bank can hardly object to our paraphrase of same to give form to the disputes at issue.

The Debtor, situated in Bristol, Bucks County, Pennsylvania, was incorporated in October 1988 for the purpose of manufacturing, selling and developing solid phase extraction ("SPE") devices. In 1992, Huls America, Inc. ("Huls"), which was then a vendor of the Debtor, approached the Debtor concerning the sale of a cost center owned by Huls that made specialty chemicals, silanes, and silicons for research laboratories. These products were niche commercial markets for chemical separation science companies such as the Debtor. Accordingly, in November 1993, the Debtor acquired the assets of that cost center from Huls, which acquisition was financed, in part, by loans and extensions of credit to the Debtor by the Bank, the Pennsylvania Industrial Development Authority ("PIDA"), the Bucks County Industrial Development Corporation ("BCIDC"), and subordinated seller financing provided by Huls.

The transactions involving the Debtor, the Bank, and, as to certain transactions, BCIDC and PIDA, included a loan of June 22, 1993, whereby the Bank advanced $140,000 to the Debtor; two loans of November 2, 1993, in the amounts of $657,000 and $200,000, respectively, to acquire the Debtor's plant at 2731 Bartram Road, Bristol Township, PA. ("the Plant"), and equip same, and lines of credit opened on April 14, 1994, in the amount of $700,000; and June 16, 1994, in the amount of $300,000, respectively.

As a result of these transactions, the Bank obtained both a security interest in all of the assets of the Debtor and proceeds thereof, and various mortgage liens on the Plant, the title to which has been placed in the name of BCIDC, and which the Debtor equitably owns. The Bank describes the present lien priorities on the Plant and the Debtor's other property as follows: (1) The Bank and PIDA have shared first priority mortgage lien on the Plant in the principal amount of $1,042,659; (2) PIDA has a second mortgage lien on the Plant in the amount of $526,580; (3) The Bank has three mortgage positions, which secure specific loans as well as all other obligations owed or incurred by the Debtor in favor of the Bank. The amount of the total indebtednesses owed by the Debtor to the Bank as of October 18, 1995, the date that the Debtor filed the instant voluntary Chapter 11 bankruptcy case, was $1,977,198 exclusive of pre-petition interest in the amount of $24,968 and attorneys fees and costs, or a total of slightly in excess of $2,000,000. The Bank emphasizes that its interest in the shared first priority mortgage lien with PIDA is 55.3%, thus providing that

all payments received from the first mortgage lien are shared between the Bank and PIDA, 55.3% (to the Bank) and 44.7% (to PIDA). Huls took a fourth mortgage in the Plant to secure an indebtedness of over $3,000,000 owed to it.

The Debtor was proceeding very profitably, and duly paying all of its obligations with little strain, until June 1994, when an industrial accident, featuring an explosion, occurred at the Plant. Fortunately, the Debtor was able to realize approximately $5,000,000 of insurance proceeds ("the Proceeds") as a result of this incident. Approximately $2,000,000 of the Proceeds were used by the Debtor for performing environmental clean-up at the Plant, demolishing portions of the building, and funding operating losses. Of the $2,970,000 of remaining Proceeds, $650,000 represents proceeds arising from damages to the Plant, which are subject to the shared first mortgage between the Bank and PIDA. The balance of the Proceeds, *i.e.,* approximately $2,300,000, is subject to the first priority perfected security interest of the Bank, to the extent of its indebtedness.

In addition to cleaning up the Plant, the Debtor was able to re-commence partial operations in October 1994. Throughout this time, and up to the date of the bankruptcy filing, the Debtor continued to make the monthly payments due to the Bank, PIDA, and BCIDC. After protracted negotiations, the Debtor was able to resolve all issues regarding the insurance coverage in May 1995, and circulated the settlement checks for signature among the secured creditors. The Debtor alleges that, when Huls would not execute the checks, it was forced to file the instant bankruptcy case on October 18, 1995.

The early stages of the case featured cash collateral hearings, at which most of the opposition was presented by Huls and Young Adjustment Co. ("Young"). Huls perceived its claim of over $3,200,000, secured only by a subordinate position in the Plant, to be particularly jeopardized by the turn of events. Young, the insurance adjuster hired by the Debtor, perceived its $88,500 claim, allegedly secured by a senior lien on the Proceeds, to be endangered.

On November 28, 1995, the Debtor moved to utilize about $1,500,000 of the proceeds to make repairs to the Plant. This court ultimately entered cash collateral orders and allowed the Debtor to expend about $25,000 towards planning for restoration of the Plant, but refused to allow further use of the Proceeds for repairs to the Plant pending confirmation of the Plan.

The negotiations ultimately resulted in the Plan, filed on March 28, 1996. The Plan features an agreement with Huls to pay it a $600,000 lump sum on the effective date, sixty (60) days after confirmation; an agreement to pay Young ninety (90%) percent of its claim; agreements with PIDA and BCIDC to pay interest on their secured claims at rates of two (2%) percent and seven and one-half (7½%) percent, respectively, per annum; and to pay mechanic's lien holders twenty (20%) percent of their claims on the effective date. Unsecured creditors were to be paid ten (10%) percent of their claims on the effective date, and additional five (5%) percent dividends on the next three anniversaries of the confirmed plan.

The only party objecting to confirmation of the Plan, other than the Bank, was Remac, a mechanic's lien holder. However, on the date of the confirmation hearing, Remac agreed to accept twenty (20%) percent treatment, provided its claims were fixed at $344,016.73 and its lien would be retained until payment was made. A motion formalizing this agreement was filed on May 24, 1996, and presumably has been noticed to all creditors. A hearing on this motion, approval of which is a final prerequisite to Plan confirmation, is scheduled on June 12, 1996, in our accompanying Order.

Unfortunately, the Debtor was not able to reach any agreement with the Bank, and the payments from the Proceeds necessary to satisfy the other creditors, plus the Debtor's desire to retain at least $1,000,000 to rebuild the Plant, required deferred payment of the Bank's claims. Treatment of the Bank's claims contemplates a cash payment of $550,497 on the effective date, which is allocated to liquidate equipment loans and a building improvement loan of about $200,000 each;

eliminating the liens arising from these loans; restructuring the mortgage to allow for interest at the present contract rate of nine (9%) percent per annum, amortized over 15 years; and, with respect to the lines of credit, a cash payment of $150,000 on the effective date, applied to the principal balance due of $1,000,000, with payments of interest only at the contract rate of one and one-half (1½%) percent above prime (9¾%) thereafter for five years, at which time the entire remaining principal balance was due.

The Bank filed the Motion on March 22, 1996, agreeing to continue an initially-scheduled hearing on the Motion of April 17, 1996, to the date of the confirmation hearing, May 15, 1996. It also filed Objections and Supplemental Objections to the Plan (collectively, "the Objections"), on April 30, 1996, and May 13, 1996, respectively, to which the Debtor filed written responses. A consolidated factual hearing of about eight hours was conducted on the Objections to confirmation of the Plan and the Motion on May 15 and May 16, 1996. At the conclusion of the hearing, the court entered an Order memorializing the parties' agreement to simultaneously submit opposing briefs on May 31, 1996.[1] The briefs address principally the issue of the Plan's feasibility and its conformity to 11 U.S.C. § 1129(b), the parties having agreed that their respective positions on the other, technical Objections were adequately set forth in the Objections and responses thereto themselves.

A detailed summary of the testimony adduced at the hearing is not necessary to our disposition. We note that the Debtor called the following witnesses: (1) John P. Gillan, whose firm was hired to plan the restoration of the Plant, and who claimed that a scaled-down version of the restoration could be accomplished for slightly over $1,000,000; (2) Martin Sigel, an appraiser, who fixed the

present value of the Plant at $520,000, and the projected restored value at $2,130,000; (3) Robert Cormack of BCIDC, who supported the Plan; (4), (5) Bernard Coyle and Michael Telepchak, the Debtor's chief financial officer and president, respectively, who presented the Debtor's projections; and (6) David Shaw, an accountant and court-appointed consultant, who assisted with the preparation of the Plan and supported its feasibility and features, notably the propriety of the terms of the Bank's treatment, including the proposed interest rates. The Bank called Tyrone Agar, a credit analyst employed by the Bank who performed a mathematical critique of the Debtor's projections; and Joseph Nowak, a consultant who opined, *inter alia*, that the appropriate rates of interest which the Bank should be paid were fourteen (14%) percent (mortgages) and eighteen (18%) percent (lines of credit). Huls presented a statement in support of the Plan in lieu of expert testimony, indicating that its acceptance of the $600,000 lump-sum payment rather than treatment as a general unsecured credit resulted in a pay-off of 18.7% of its claim, as opposed to 19.8% to 20.5% pay-off for general unsecured claims.

## C. DISCUSSION

### 1. The Debtor's Plan Is Eminently Feasible.

Our legal analysis will begin by assessing the Plan's feasibility, and then move on to the § 1129(b) issues raised by the Bank. We will then briefly address the technical Objections raised by the Bank. In sum, we find that feasibility of the Debtor's Plan, especially when compared to our other cases where this requirement was placed in issue, is particularly strong. This finding carries the Debtor through the slightly closer issue of whether the treatment of the Bank is suffi-

---

1. Simultaneous submissions have the effect of speeding the briefing process and expediting disposition of matters before the court. We perceived the issue of expedition to be important here, because the Debtor's plans for restoration of the Plant are effectively on "hold" pending our resolution of these matters. The downside of such briefing, especially when no reply briefs are scheduled, as here, is that the parties may not totally understand the other's position and may

address matters not deemed at issue by the other. To some extent, this phenomenon occurred here, and it requires the court to give some attention to defining the issues. However, both counsel are quite experienced and performed very competently, anticipating accurately most issues. Our tendency will be to focus on and address the arguments of the unsuccessful party (the Bank), recognizing that the Debtor has not been able to do so directly.

ciently "fair and equitable" under § 1129(b). None of the technical Objections merit checking the Debtor's momentum. We feel quite confident that this Plan will work and, given the Debtor's predicament and resources, it represents a fine example of how Chapter 11 can be utilized to serve the intended purpose of preserving jobs and stabilizing the economy.

The requirement of plan feasibility is set forth in 11 U.S.C. § 1129(a)(11), as follows:

(a) The court shall confirm a plan only if all of the following requirements are met:

   .     .     .     .     .

(11) confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

We recently thusly set forth our prior statements on this issue in a reported case raising similar issues, *In re Mayer Pollock Steel Corp.*, 174 B.R. 414, 421 (Bankr.E.D.Pa. 1994), quoting *In re Calvanese*, 169 B.R. 104, 109 (Bankr.E.D.Pa.1994):

"This court has rarely denied confirmation of a plan on the ground of lack of feasibility. As we stated in *In re Orfa Corp. Of Philadelphia*, 129 B.R. 404, 410–11 (Bankr. E.D.Pa.1991),

'[t]he standards for determining plan feasibility are not rigorous. *See, e.g., In re Temple Zion*, 125 B.R. 910, 914 (Bankr.E.D.Pa.1991); *In re 222 Liberty Associates*, 108 B.R. 971, 985–86 (Bankr. E.D.Pa.1990); *In re Orlando Investors, L.P.*, 103 B.R. 593, 600 (Bankr.E.D.Pa. 1989); and 5 COLLIER ON BANK-RUPTCY, ¶ 1129.2(11) [sic], at 1290–39.11.

"Caseload has established that bankruptcy court[s] must consider several factors In making a feasibility determination: (1) the adequacy of the debtor's capital structure; (2) the earning power of its business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of the continuation of the same management; and (6) any [of] the related matters which determine the prospects of a sufficiently successful operations to enable performance of the provisions of the plan. *See, e.g., Liberty Associates*, 108 B.R. at 986; *In re Gulph Woods Corp.*, 84 B.R. 961, 973 (Bankr.E.D.Pa.1988), *aff'd*, C.A. No. 88–4081 (E.D.Pa. Feb. 24, 1989); and *In re Landmark of Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr.D.N.J.1980)."

*Temple Zion, supra*, 125 B.R. at 915.' "

The Bank devotes only seven pages of its 50–page brief to this issue. The arguments presented therein, without any factually-analogous case support regarding the significance of such criticisms, are (1) the Debtor suffered losses in 1994, 1995, and 1996, and it has no track record of profits after the Huls acquisition to support its anticipated return to profitability after the repair of the Plant; (2) the Debtor's 1997 projected income statement contains a mathematical error; $191,839 is recorded as the annual operating profit (instead of the actual higher sum of the quarters of $208,840); and (3) the Debtor's Disclosure Statement bespeaks of a $1,500,000 cost to repair the Plant, while only about $1,000,000 is so allotted under the Plan.

The third argument was addressed at length by Gillan. He credibly testified that a serviceable, no-frills product, scaling down earlier models which were probably prepared for the eye of insurers, could be achieved. This testimony was not rebutted. The second argument is simply trivial, and in no sense undermines our confidence of the general competency of Gillan, Coyle, or Telepchak.

■ The first argument raises a more legitimate point. The Debtor's projections are somewhat speculative. However, the Debtor's circumstances, especially when compared to those of the debtors at issue in *Mayer Pollock, Orfa*, and *Temple Zion*, where we found the feasibility requirement to be satisfied, are very sanguine. The Debtor was highly profitable prior to the industrial accident at its Plant. No evidence or insinuation has been set forth that such an accident is likely to recur, or that the introduction of the Huls process into the Plan had any connection therewith. The lack of profitability in

1994, 1995, and 1996 was clearly the direct result of the catastrophic and likely non-recurrent explosion at the Plant. Compared to an individual, the Debtor is like a healthy person who was affected with a serious illness, but who has responded well to treatment. The prognosis for recovery, while not certain, is good. Chapter 11 appears well-suited to allowing debtors to overcome such curable pitfalls.

In *Mayer Pollock*, the debtors were engaged in the business of selling scrap steel, described therein as something less than "the backbone of the economy" or "the most socially significant accomplishments of man." 174 B.R. at 423. The local steel industry is not healthy. The *Mayer Pollock* debtors' typically-rosy projections were countered by the detailed analysis of a skilled accountant, well-known to the court, who revealed significant deficiencies in the debtors' calculation and posited the debtors' financial failure. *Id.* at 417, 421–22. Ultimately, we nevertheless found the debtors' attempted rebuttals sufficient to overcome the roadblocks to feasibility identified by the lender's expert witness. *Id.* at 421–22.

The *Orfa* case, meanwhile, presented a debtor which owned an innovative technology addressing the very topical issue of waste disposal. While the debtor's process was lauded by many experts, sufficient to cause us to conclude that the investors' plan was feasible in the face of vigorous lender skepticism, the process and its financial backing were untested. Ultimately, funding could not be found. *See In re Orfa Corp. of Philadelphia*, 149 B.R. 790, 793 (Bankr.E.D.Pa. 1993), *vacated*, 170 B.R. 257 (E.D.Pa.1994).

*Temple Zion* was a real-estate case, and the plan was dependent on the sale and development of ground adjacent to the debtor's synagogue which presented zoning and topographical problems. It was hoped that these could be overcome. Two bankruptcies later, they were. Like many real estate bankruptcies, optimism of a change in a generally down real estate market was a necessary component of plan feasibility in that case.

The instant Debtor is involved in a business having far greater upside potential than real estate or the steel industry. Furthermore, the Debtor's development is far more mature than that of the *Orfa* debtor. There is, hence, good reason to accept the Debtor's optimism. This is, in fact, an unusually robust Debtor, whose financial difficulties can be easily traced to a distinct occurrence (the explosion) which, as noted above, was at once catastrophic and appears unlikely to recur. We therefore conclude that plan feasibility rests not only on the non-rigorous nature of this requirement, but on a realistic prognosis of a return to a resoundingly successful business operation. We therefore conclude that the Debtor's satisfaction of the feasibility requirement is by such a wide margin that, if necessary, we would be prepared to allow some leeway to the Debtor in satisfaction of other prerequisites for confirmation.

2. *The Plan Satisfies the Requirements of § 1129(b).*

■ In light of the non-acceptance of the Plan by the class consisting of the Bank, a secured creditor, the Debtor is obliged to satisfy the requirements of 11 U.S.C. §§ 1129(b)(1), (b)(2)(A) in order to achieve confirmation of the Plan. The pertinent subsections of this Code section provide as follows:

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such

liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) ...; or

(iii) for the realization of such holders of the indubitable equivalent of such claims.

The Bank's § 1129(b) arguments have at least a slightly greater degree of merit than their objections based on § 1129(a)(11). These arguments are as follows: (1) the loss of its liens on the Debtor's equipment violates § 1129(b)(2)(A)(i)(I), which requires that it retain all of its liens; (2) the limitation of payments on the credit line obligations to "interest only" effectively triggers "negative amortization" of its debt, requiring consideration of the factors for allowance of negative amortization set forth in *In re Wynnefield Manor Associates, L.P.*, 163 B.R. 53, 59 (Bankr.E.D.Pa.1993), and resulting in a violation of § 1129(b)(2)(A)(i)(II). Particular emphasis is placed upon the alleged insufficiency of the rates of interest paid; and (3) alternatively, the Plan does not satisfy § 1129(b)(2)(A)(iii) because the "replacements" offered to the Bank's secured interest in the cash of the Proceeds fall far short of being the "indubitably equivalent" thereof.

■ In support of an argument that the Debtor's treatment of it is generally unfair, the Bank cites initially to *In re EFH Grove Tower Associates*, 105 B.R. 310, 313–14 (Bankr.E.D.N.C.1989), a real estate case in which the debtor was precluded from requiring a wrap mortgagee to wait five years to receive any payment, and then only to the extent of half of the post-petition financing supplied by an insider. The treatment of the Bank here is considerably better than that of the *EFH* wrap mortgagee. Over a quarter of its indebtedness, in excess of $550,000, is paid off in cash at the effective date. Liqui-

dation of the principal on the mortgage begins immediately, albeit lasting for 15 years.

The only lien lost is that on the Debtor's equipment and machinery, due to the liquidation of the particular loan secured by these items. Arguably, the equipment lien is separate security which is rightfully retired when the loan securing it is liquidated. While we can conceive of settings in which this concept of forced allocation of payments to certain obligations owed to a creditor, in order to eliminate certain security interests, might be so inequitable as to violate § 1129(b)(2)(A)(i)(I), the instant setting does not appear to be one. The Bank's lien on the Debtor's equipment is hardly as valuable as liens on its liquid assets and/or its real estate. We therefore find no violation of § 1129(b)(2)(A)(i) in these Plan provisions.

■ The Bank's suggestion that the "effect" of its treatment is comparable to negative amortization of its claim is not well-taken. It is, again, receiving immediate payment of more than a quarter of the debt owed to it. The principal of the mortgage debt is being retired during the Plan, again, albeit over 15 years. Even if it were appropriate to isolate the credit line debts, the payment of $150,000 or fifteen (15%) percent of that obligation, in cash on the effective date, plus payment of full interest on the balance of that indebtedness thereafter, is hardly the equivalent of negative amortization, by any definition. The Bank's hyperbole in characterization of the Plan's effect on its indebtednesses serves only to heighten our skepticism of the accuracy of the Bank's factual and legal analysis.

We therefore do not accept the Bank's invitation to consider the ten factors cited in *Wynnefield Manor* to be weighed to determine whether the Debtor can satisfy § 1129(b)(2)(A)(i)(II). However, since the Bank's argument, perhaps its major argument, is presented in this light, we will, for the sake of addressing the issue raised by the Bank, begin by noting these factors, which are set forth, 163 B.R. at 59, as follows:

1. Does the plan offer a market rate of interest and present value of the deferred payments;

2. Is the amount and length of the proposed deferral reasonable;

3. Is the ratio of debt to value satisfactory throughout the plan;

4. Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;

5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;

6. Are the risks unduly shifted to the creditor;

7. Are the risks borne by one secured creditor or class of secured creditors;

8. Does the plan preclude the secured creditor's foreclosure;

9. Did the original loan terms provide for negative amortization; and

10. Are there adequate safeguards to protect the secured creditor against plan failure.

It is in this context that the Bank challenges the interest rates proposed by the Debtor, contending that Nowak's fourteen (14%) percent and eighteen (18%) percent hypothecations should be preferred to Shaw's contention that continued use of the contract rates of nine (9%) percent on the mortgages and 9¾% on the credit lines are comparable to the current market rates and hence are perfectly acceptable.

The propriety of the deferral interest rate to be employed in a Chapter 11 cramdown was a significant issue addressed in *Mayer Pollock, supra,* 174 B.R. at 418–20. There, citing to *In re River Village Associates,* 161 B.R. 127, 135–39 (Bankr.E.D.Pa.1993), *aff'd,* 181 B.R. 795 (E.D.Pa.1995), where we surveyed the pertinent law and decided that a nine (9%) percent interest rate in payment to the mortgagee of a single real estate debtor sufficed, we stated as follows:

> We acknowledged that, in setting an appropriate rate in a Chapter 13 case, pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii), which utilizes much the same language as § 1129(b)(2)(A)(i)(II), the controlling case of *General Motors Acceptance Corp. v. Jones,* 999 F.2d 63, 67 (3d Cir.1993), established the method of fixing the appropriate deferred interest rate as that which the

particular secured lender whose secured claim was being converted into a coerced claim would normally charge for a loan "similar in character" to the "coerced loan" provided for in a plan. However, *Jones* further held that, if the secured creditor "failed to come forward with persuasive evidence that the current rate is in excess of the contract rate," *id.,* at 70–71, then the contract rate should be used.

In *River Village,* we concluded that we could not apply the "similar loan" formulation set forth in *Jones* because the evidence supported the conclusion that neither the secured creditor nor any comparable lenders would make any loan "similar in character" to the "coerced loan" in issue. 161 B.R. at 138. We considered applying the contract rate, noting that the contract rate should always serve as a guide in determining the proper interest rate in a cramdown scenario. 161 B.R. at 138–39. However, we finally determined that the proper interest rate to be used in that setting was "the risk-free rate plus an additional premium for risk." *Id.* at 139. Application of that analysis caused us to ultimately accept as appropriate the nine (9%) percent risk-free rate payable on a comparable Treasury Bill, plus a three (3%) percent risk premium. This figure was, moreover, comparable to the contract rate (the regular contract rate was 7.7625 percent, but the default rate, which apparently was applicable, was eleven (11%) percent). *Accord, In re Wynnefield Manor Associates,* 163 B.R. 53, 59–60 (Bankr.E.D.Pa.1993) (nine (9%) percent rate approved); and *In re Union Meeting Partners,* 160 B.R. 757, 762, 778 (Bankr.E.D.Pa.1993) (9.125 percent rate, consistent with the contract rate, held acceptable).

The *Mayer Pollock* debtor proposed an interest rate of nine (9%) percent fixed or 1½% above prime, at the choice of the lender. The prime interest rate was then 8½% (we referenced the time as one "of rising interest rates," 174 B.R. at 419). Similar to here, the bank lender presented a witness who opined that the correct rate should be five (5%)

percent to six (6%) percent above prime. We nevertheless sustained the debtor's position, holding that the debtor's evidence supported the propriety of the result under the *River Village* reasoning and, alternatively, that the lender failed to present "persuasive evidence" that the contract rate was insufficient. *Id.* at 420.

■ No reason for a different result portends here. While not offering the lender the choice of nine (9%) or 1½% above prime on the Bank's entire debt, as did the *Mayer Pollock* debtors, the instant Debtor is offering nine (9%) percent interest on the smaller indebtedness, on which the principal will be amortized, and 9¾%, which is 1½% above prime, on the larger debt, which will not be amortized. Interest rates are not rising at present. The record established that the prime rate is presently 8¼%, less than at the time of confirmation of the *Mayer Pollock* plan. Furthermore, we find Nowak's testimony of possible fourteen (14%) or eighteen (18%) percent rates to be divorced from any solid factual data and hence unpersuasive. Therefore, as in *Mayer Pollock,* reversion to the contract rates would, in the alternative, be appropriate.

Without belaboring the application of the other *Wynnefield Manor* elements, which we deem inappropriate to apply in the absence of negative amortization, suffice it to say that we find plan feasibility to be strong, far stronger than in the single asset realty cases where "real" negative amortization is frequently proposed. We should also note that the Bank's real estate collateral bears a significant prospect of appreciation, particularly when compared with the prospects in most in single-asset realty cases. We accept Gillan's testimony that significant repairs can be made to the Plant with an investment of about $1,000,000 and Sigel's unrebutted appraisal testimony that the value of the Plan will increase by about $1,500,000 upon the infusion of such repairs and investments in the Plant.

■ We therefore conclude that the Debtor has satisfied the requirements of § 1129(b)(2)(A)(i). It is therefore unnecessary for us to discuss the Debtor's potential satisfaction of § 1129(b)(2)(A)(iii). We do not interpret the Debtor's brief as suggesting any reliance on § 1129(b)(2)(A)(iii) in any event. *See* page 720 n. 1 *supra.* Furthermore, we do not think that § 1129(b)(2)(A)(iii) is actually pertinent to a situation where, as here, the Debtor is paying off and retiring in part, but not actually replacing, the collateral of the secured creditor.

3. *The Bank's Technical Objections Lack Merit.*

All that remains are the Bank's series of technical Objections. We find none of these to have merit. In summary fashion, we will state each and immediately thereafter, as referenced by "A." (for "Answer"), articulate our reasons for rejecting same as bases for denial of confirmation.

■ 1. Section 1129(a)(1) is violated by a classification of administrative claims, contrary to § 1123(a)(1).

A. As the Debtor indicates, § 1123(a)(1) merely requires classification of claims other than administrative claims, as the Plan does, rather than prohibiting the classification of administrative claims. *See* 5 COLLIER ON BANKRUPTCY, ¶ 1123.01[b], at 1123–6 to 1123–7 (15th ed. 1995).

■ 2. The Plan violates § 1123(a)(4) because it does not provide that the Debtor's counsel or accountant must file proofs of claim or fee applications.

A. Nor does the Plan provide that these professionals need not file fee applications, and of course they must.

■ 3. The Plan fails to list the insiders' compensation.

A. The Debtor's compliance with Local Bankruptcy Rule 4002.1, requiring notice of any officer's compensation within 45 days of the filing of the bankruptcy case, accomplished here without objection, suffices to satisfy this requirement.

■ 4. The Plan violates § 1129(a)(7) because the Bank receives less than it would receive if the Debtor were liquidated. (This

**726**

Objection is reiterated in the Supplemental Objections.).

A. While it is true that the Bank receives less cash on the effective date than it would if the Debtor were liquidated on that date, the § 1129(a)(7) test does not require it to do so. Rather, the court assumes, in applying this test, that the creditors will receive what is provided for them under the Plan and, if this provision pays them in full, even over time, and the Plan is feasible, this requirement is met. *See In re Rota,* 1990 WL 90968, at *2 (Bankr.E.D.Pa. June 26, 1990). The instant Plan satisfies §§ 1129(b)(2)(A) and 1129(a)(11), *see* pages 720–25 *supra,* and it therefore meets these requirements.

5. The Plan violates § 1129(b)(1) because it treats Huls and Young better than other unsecured creditors.

A. Huls and (especially) Young claim secured status, and it has not been determined that their claims are not secured. In any event, the treatment of various unsecured creditors has no effect on the treatment of the Bank's own claims, and therefore the Bank lacks standing to assert such Objections. *See, e.g., In re B. Cohen & Sons Caterers, Inc.,* 124 B.R. 642, 647 (E.D.Pa. 1991).

6. The Plan violates the absolute priority rule, codified in § 1129(b)(2)(B)(ii).

A. In addition to, again, lack of standing, as the Bank is a totally secured creditor and the absolute priority rule references plan treatment of unsecured creditors, we note that, since the class of unsecured creditors has accepted the Plan, the absolute priority rule is not applicable. *See, e.g., In re 641 Associates Ltd.,* 140 B.R. 619, 629 (Bankr.E.D.Pa.1992).

7. The Plan has not been filed in good faith and violates § 1129(a)(3) because the Debtor's shareholders are not obliged to make a financial contribution (referenced in the Supplemental Objections).

A. There is no requirement that shareholders fund a plan. The necessity of shareholders to contribute financially to a plan arises only if the plan seeks to overcome the absolute priority rule by way of the "new value exception" which, as is indicated in ¶ 6 *supra,* is not relevant where unsecured creditors have accepted the plan.

For the following reasons, we easily conclude that the Bank's technical Objections have no merit. The objections may therefore be overruled in their entirety. The only open matter which precludes confirmation of the Plan at this juncture is the Debtor's need to obtain court approval of its settlement with Remac, which will result in the withdrawal of Remac's objection to confirmation.

At the close of the confirmation hearing, we continued several related motions, notably the Debtor's motions to extend the exclusivity period and to separately obtain permission to use the Proceeds to fund the restoration of the Plant, until June 12, 1996. These matters will apparently be rendered moot by Plan confirmation, but their scheduling remains intact pending actual confirmation, which has not yet occurred. Although the Debtor did not notice the motion to approve the settlement with Remac until May 24, 1996, we will schedule a hearing to consider the motion to approve this settlement and any Objections thereto on the same date, June 12, 1996, and require the Debtor to forthwith so notify all interested parties. In that way, the stage is set for confirmation of the Plan on June 12, 1996.

*D. CONCLUSION*

An Order will be entered setting forth the conclusions reached on the issues addressed herein.