**In re APPLIED SAFETY, INC., Debtor.**

**Bankruptcy No. 95–17950DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Sept. 13, 1996.

---

Thomas Maiorino, Astor Weiss Kaplan & Rosenblum, Philadelphia, PA, for Debtor.

Toby M. Daluz, Philadelphia, PA, for Breed Technologies, Inc.

Barry E. Bressler, Pelino & Lentz, P.C., Philadelphia, PA, for Pelino & Lentz, P.C., Creditor.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Before this court for determination is whether we should confirm the First Amended Plan of Reorganization ("the Plan") of APPLIED SAFETY, INC. ("the Debtor") in the face of the rejecting vote and objections to confirmation of the Plan ("the Objections") filed by Breed Technologies, Inc. ("Breed"). The Plan, proposed by a debtor which has ceased doing business, attempts to realize its only real asset, assertion of legal rights against Breed, financing same by recoveries allegedly due from Breed. Not surprisingly, none of the Debtor's creditors other than Breed oppose the Plan, or would be likely to oppose any plan which presents any glimmer of recovery of their claims. Equally predictable are Breed's vociferous objections to the Plan.

Since the Plan separately classifies Breed, and neither the Debtor nor Breed is willing to commit to Breed's designation as a secured or an unsecured creditor, the Debtor is obliged to establish either that Breed is unimpaired or is unable to preclude confirmation under 11 U.S.C. §§ 1129(b)(2)(A) and 1129(b)(2)(B). As we conclude rather easily that Breed *is* impaired and that the Debtor cannot meet the requirements of § 1129(b)(2)(A) *or* § 1129(b)(2)(B), the Plan cannot be confirmed.

Nor, after some reflection, do we think that any plan could be confirmed unless and until the status of Breed's claim is resolved. A hearing on the Debtor's objection to that claim is scheduled on September 18, 1996. In light of the apparent importance of that issue, we will designate that disposition for hearing on a must-be-heard basis.

At this point, prior to that hearing, we are unwilling to conclude that the Debtor could not achieve confirmation of a plan, since the limited record before us presents the prospect that the Debtor could succeed in asserting rights against Breed and in formulating a confirmable plan. However, given that this

case is now almost a year old, and that the filing anniversary will probably pass before the status of Breed's claim is resolved, the Debtor will likely receive only one additional clear chance at confirmation before conversion to Chapter 7 will result.

## B. PROCEDURAL AND FACTUAL HISTORY

The Debtor filed the instant voluntary Chapter 11 case on October 6, 1995. The filing appears to have been timed to stay a Florida state court suit by Breed seeking recission of a contract providing for the payment of royalties to the Debtor from Breed on sales of retrofit automobile driver's-side air bags on vehicles unequipped with same by their manufacturers. Through the Plan, the Debtor seeks to impose upon Breed the same terms as it alleges are contained in the aforementioned contract. Breed, however, wants to avoid the contract, and asserts, in the Florida litigation, as well as here, that the Debtor has no valid right to collect any royalties from it.

There was virtually no activity in this case, except establishing April 26, 1996, as the deadline for the Debtor's filing of a plan in this case after a status hearing of January 17, 1996, until February 15, 1996. On that date, Breed filed a "haymaker" motion, seeking in the alternative dismissal of this case as a "bad faith" filing which would not lead to confirmation, conversion of this case to Chapter 7, or relief from the automatic stay. After a hearing of March 20, 1996, on this motion, concluding that the Debtor's claims against Breed had potential merit but that a forum selection clause in the parties' contract requiring litigation in Florida appeared enforceable, see In re Diaz Contracting, Inc., 817 F.2d 1047, 1050–55 (3d Cir.1987), we entered an Order denying this motion with the statement that

> [a]lthough in a liquidation mode, funding [of a plan] is supported by a non-frivolous claim of the Debtor against the Movant. Since the issues in state court litigation could be tried in what may be more efficient forums related to this case, stay relief to proceed with critical litigation in a Florida state court should not be granted at this time.

The transcript of the hearing on this motion, incorporated into the instant record, established that the Debtor was formed for the purpose of marketing automotive safety equipment. In particular, the founders of the Debtor wanted to develop and market an air bag devise that could be used to retrofit existing cars with driver's-side air bags. To this end, the Debtor sought out Breed, which manufactured air bag equipment, and convinced it of the viability of developing such a product. Subsequently, on November 8, 1993, the parties entered into a contract designated as a Distribution Agreement ("the Distribution Agreement") giving the Debtor a nonexclusive right to distribute the air bag products which Breed was by this time beginning to manufacture. The Debtor's obligation under the Distribution Agreement was to set up a network of installers to sell the air bags in the consumer market. The Distribution Agreement provided that the Debtor would be paid a commission for each air bag sold, the retail price of which was estimated to be $550 per bag.

Pursuant to the Distribution Agreement, Breed delivered about 2,000 air bags to the Debtor with the understanding that the Debtor would pay for them with proceeds from future sales. Payment was initially due 90 days after delivery. Thereafter, the Debtor began to develop a dealer network and, in fact, did sell about 1,000 of the bags it received, but it was never able to pay Breed for the bags that were already delivered. Breed claimed to be owed in excess of $600,-000 for those bags.

In summer 1994, at which time Breed still had not been paid, Breed gave the Debtor notice that it was terminating the Distribution Agreement. The parties then negotiated a new agreement, which is the contract presently at issue, whereby the parties arranged the dissolution of their relationship. This contract, which is designated simply as the "Agreement" but which Breed references, perhaps accurately, by what will be our designation, "the Termination Agreement," requires the Debtor to return all air bags in its possession to Breed in exchange

for credit against its debt. Further, the Termination Agreement also requires Breed to pay the Debtor a royalty of $30 for each air bag Breed was later able to sell, half of which was to be retained by Breed and applied toward payment of the Debtor's debt.

Over the next year, the parties' relationship continued to deteriorate, and by summer 1995, Breed filed the above-referenced law suit against the Debtor in a local Florida state court to rescind the Termination Agreement. In that suit Breed claims to have been defrauded by the Debtor because, according to Breed, the Debtor's installer network was based on promises by the Debtor to installers which were not disclosed to Breed and that the Debtor must have known Breed would not be able to fulfill. For instance, the Debtor apparently promised to purchase insurance for the installers against liability for the product, which was not a commitment made by Breed.

Expressing concern that its claims would receive due consideration in a state court proximate to Breed's location, the Debtor responded vigorously to Breed's allegations by pointing out that paragraph one of the Termination Agreement states that Breed will only enter into relationships with dealers which Breed, in its sole discretion, deems to be qualified. Consistent with the tone of paragraph one, the Debtor contends that the Termination Agreement contained no warranties or representations about the nature or quality of the dealer network it was to establish. The Debtor also presented evidence that Breed was in the process of negotiating a distribution agreement with Midas Muffler Corporation ("Midas"), which has a nationwide chain of franchises, to sell and install the air bags in Midas locations for $350 each, which is $200 lower than the price for which Breed previously anticipated selling them. Since the reduced price would render payment of the $30 commission to the Debtor difficult for Breed to fulfill, the Debtor argues that Breed wants to rescind the Termination Agreement primarily to make a prospective contract with Midas economically feasible.

Our Order of March 20, 1996, was based on our recognition of possible merit in the Debtor's claims. Our statements regarding the probable validity of the forum selection clause apparently caused the Debtor to abandon an Application to appoint Leon Silverman, Esquire, as its special counsel to institute an adversary proceeding against Breed in this court. Apparently, the Debtor also decided to attempt to achieve confirmation with its dispute with Breed unresolved, and attempt to establish a mechanism to finance its end of the litigation with Breed through the plan.

As directed, on April 25, 1996, the Debtor filed a plan and disclosure statement. At the initial confirmation hearing of July 10, 1996, the Debtor acknowledged a need to amend the plan to eliminate objections thereto by federal and state taxing authorities, as well as to attempt to resolve certain objections raised thereto by Breed. On July 24, 1996, per an Order of July 11, 1996, the Debtor filed the instant Plan.

The Debtor also filed on that day an objection to Breed's proof of claim in the amount of $303,776.53, asserting both secured and unsecured status. The hearing on that objection was initially scheduled on September 4, 1996. However, due to a vacation of Breed's counsel, the hearing was continued by agreement until September 18, 1996.

The confirmation hearing relative to the Plan was held on August 7, 1996, at which only Breed appeared to press objections to confirmation of the Plan. The Debtor's primary witness at the confirmation hearing was John R. DePhillipo, its chief operating officer and the Chairman of its Board of Directors, who summarized the Debtor's agenda for "reorganizing." DePhillipo indicated that the Debtor planned to initiate litigation against Breed to enforce the Termination Agreement and recover all unpaid royalties owed to the Debtor thereunder. He indicated, however, that such a lawsuit could not be properly filed and litigated until a sizable fund of unpaid royalties were accumulated on account of the actual sale of a significant number of air bags by Breed. Provided that such a fund came into existence, the Debtor opined that it would be able to obtain counsel to litigate the case against Breed on a contingency basis. Assuming that such a lawsuit were successful, the Debtor would then use the money it collected to pay its creditors in full. First,

Breed would be paid in full through its permission to set off its claim against half of the royalties collectable from it by the Debtor. Second, general unsecured creditors will be paid in full with interest by the Debtor by use of the funds that it intends to collect from Breed. The other witness at the hearing was Attorney Silverman, who testified that the Silverman/Stein Family Partnership ("the Partnership"), a large creditor of the Debtor with which Silverman was associated that voted to accept the Plan, was not involved in the Debtor's operations.

The Plan divides claimants into the following five classes: Class A—administrative claims; Class B—priority tax claims; Class C—general unsecured Claims; Class D—Breed's claim; and Class E—equity interest holders. A notable unusual feature of the Plan is its long-extended effective date, which is fixed at the time when the Debtor accumulates royalty payments from Breed in excess of administrative claims but in no event later than March 31, 2000.[1]

The Plan also proposes to pay the priority tax claims, totaling about $16,000, in full from post-confirmation contributions by the Debtor's shareholders. The shareholders' contributions are to be in the amount of $1,000 every six months, through the effective date. *See* pages 590–91 *infra*. Class C general unsecured claims will be paid in full with interest, accruing at eight (8%) percent per annum, beginning on the effective date. Class C voters included five trade creditors and two large equity-interest holders, Michael Soble and the Partnership.[2] The Plan provides for full payment of the Class D claim of Breed in accordance with the provisions of the Termination Agreement, and declares that Breed's contractual rights under the Termination Agreement are unimpaired. Finally, the Plan states that the

Class E equity security holders will retain a "contingent ownership interest" in the Debtor to the extent that all senior claims are paid in full, at which time they will not be entitled to any distribution or benefit from the reorganized debtor. Not surprisingly, as noted previously, all voting creditors accepted the Plan except Breed. At the close of the confirmation hearing, we requested the parties to submit memoranda in support of their respective positions, which the parties ultimately extended to August 29, 1996.

## C. DISCUSSION

In its brief, Breed begins by arguing that, when Soble and the Partnership are deemed as insiders, and it is recognized that its own claims cannot be classified separately from general unsecured creditors, the Plan violates § 1129(a)(10), because it lacks acceptance by an impaired class. It next argues that the Plan, the success of which is based on litigation which Breed, as its target, deems lacking in merit, is not feasible and was proposed in bad faith. After briefly arguing that the plan violates §§ 1129(a)(7) and 1129(a)(9)(A), Breed then states that, "in the alternative," the Plan violates the "absolute priority rule" codified in § 1129(b)(2)(B). The Debtor responds, with mixed success, to each of these issues raised by Breed.

1. *Breed's Objections Based on § 1129(a)(10), That the Plan Has Not Been Accepted by an Impaired Class Lacks Merit Because There Is a Reasonable Basis for Classifying Breed's Claim Separately from the Class of General Unsecured Creditors, Which Otherwise Unanimously Accepted the Plan.*

■ Breed argues at some length that Soble and the Partnership, being equity securi-

---

1. The propriety of establishing such a delayed effective date is highly questionable. *See In re Jones*, 32 B.R. 951, 958 n. 13 (Bankr.D.Utah 1983); and 5 COLLIER ON BANKRUPTCY, ¶ 1124.03[7], at 1124–28 (15th ed. 1996) (effective date should be the date of confirmation or a date close thereto). Breed has not raised the general impropriety of the Plan's effective date among its objections, either to plan feasibility or elsewhere. *See* page 587 *infra* (delayed effective date noted in discussing Breed's objection to the delay in payment of administrative claims). However, this aspect of the Plan could render it

infeasible, and, although we will not discuss the issue of the propriety of the Plan's effective date any further here, we strongly suggest that the Debtor cure this defect if it wishes to have an amended plan confirmed.

2. The Schedules designate nine shareholders of the Debtor, holding a total of 1,067 shares of stock. The Partnership and Soble are listed as the owners of 240 shares and 238 shares, respectively, both of which amounts exceed twenty (20%) percent of the 1,067 total shares.

ty holders, are insiders whose votes may not be counted when totaling acceptances. It then argues that, when Breed is properly placed among the general unsecured creditors in Class C, the amount of its claim precludes acceptance by that class. The Debtor, noting that, if the votes of Soble and the Partnership are not discounted, Class C would accept the Plan even if Breed's vote is included in that class, takes up Breed's argument regarding the insider status of Soble and the Partnership.

In order to discourage the Debtor from "fixing" the Plan by including Breed's present claim in Class C, we would note: (1) Soble and the Partnership appears to be insiders, not on the specific bases argued by Breed, but in light of their apparent status as "affiliates" of the Debtor owning twenty (20%) percent or more of the Debtor's stock. *See* page 581 n. 2 *supra;* and 11 U.S.C. §§ 101(31)(E), (2)(A); and (2) classifying Breed in Class C is problematic, because Breed's claim is so unlike the claims of general unsecured creditors that it would have been improper not to have separately classified Breed's claim.

■ The only guidance provided by the Bankruptcy Code on the classification of claims is 11 U.S.C. § 1122(a) which states that "a plan may place a claim ... in a particular class only if such claim ... is substantially similar to other claims ... of such class." This section addresses the issue of when it is inappropriate to place claims in the same class, but it does not address the issue of when claims may be separately classified. General principles applicable to the latter issue have been established in the caselaw. Foremost among the rules established to guide the separate classification of claims is the dictate that claimants may not be separately classified solely for the reason of creating an impaired accepting class under 11 U.S.C. § 1129(a)(10). *See John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associates,* 987 F.2d 154, 159 (3d Cir.1993); *In re Bryson Properties, XVIII,* 961 F.2d 496, 502 (4th Cir.), *cert. denied,* 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); and *In re Greystone III Joint Venture,* 948 F.2d 134, 139 (5th Cir.1991), *recon-*

*sidered in part,* 995 F.2d 1274 (5th Cir.), *cert. denied sub nom. Greystone III Joint Venture v. Phoenix Mut. Life Ins. Co.,* 506 U.S. 821, 822, 113 S.Ct. 72, 72, 121 L.Ed.2d 37 (1992). These cases hold that, if claims are separately classified, there must be some independent reason for the classification other than simply trying to achieve an accepting class. *See John Hancock, supra,* 987 F.2d at 159; *Bryson, supra,* 91 F.2d at 502; and *Greystone, supra,* 948 F.2d at 139.

In *John Hancock, supra,* the court held that a debtor was not permitted to classify an unsecured deficiency claim apart from the claims of other unsecured creditors. The court held that the unregulated ability to classify claims could result in the creation by debtors of arbitrary classes designed solely to circumvent the integrity of the voting process. 987 F.2d at 159. The court thus stated, at *id.:*

> [A determination of] whether a classification scheme is reasonable, ... must be informed by the two purposes that classification serves under the Code: voting to determine whether a plan can be confirmed (*see* 11 U.S.C. § 1128(a)(8), (10) (1988)) and treatment of claims under the plan (*see* 11 U.S.C. § 1123(a)(4) (1984)). Thus, where, as in this case, the sole purpose and effect of creating multiple classes is to mold the outcome of the voting, it follows that the classification scheme must provide a reasonable method for counting votes. In a "cram down" case, this means that each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed.

Under the facts of the instant case, the classification scheme crafted by the Debtor, relegating Breed to a separate class, appears reasonable when considering the nature of Breed's claim vis-à-vis those of other creditors and the treatment of these different claims under the Plan. Breed's position stands apart from other creditors in at least two respects. First, Breed has filed a proof of claim in the amount of $303,776.53, which it claims is secured, at least as to an unspecified portion thereof subject to its setoff

rights. *See* 11 U.S.C. § 506(a) (providing that a claim subject to being set off is treated as a secured claim). Second, Breed may actually owe the Debtor a substantial amount of money under the Termination Agreement. If events unfold as hoped by the Debtor, and this scenario is not totally divorced from reality, the royalties generated by the sale of air bags by Breed will not only produce enough revenue to repay Breed's claim in full, but also they will fund the payment of all other creditors' claims under the Plan.

No other creditor occupies a role in the Debtor's Plan similar to that of Breed. All other creditors enjoy simple debtor-creditor relationships in which the Debtor owes their claims without the intervention of other countervailing obligations. The Debtor's Plan is designed around the goal of suing Breed, enforcing the Termination Agreement, and using the proceeds as the Plan's funding source. Under these circumstances, in which, practically speaking, all other creditors look to Breed to fund the Plan and pay their claims, it appears that Breed's voting interest is sufficiently distinct and weighty to justify separate classification.

Moreover, Breed's claim is subject to different treatment than all other claims under the Plan. Because Breed may be paid its claim in part by setting off the claim against half of each royalty payment, Breed will necessarily be paid first, even before funds are turned over to the Debtor. The rest of the creditors will then share in the proceeds which the Debtor would receive from Breed, which will be distributed on a pro rata basis until they are paid in full. Consequently, as a function of its setoff right under the Termination Agreement, the Plan actually intends to pay Breed at a faster rate and in a more efficient manner than other creditors. This dissimilar treatment, which is reasonable in the context of the Plan, also distinguishes Breed from the general unsecured creditors and justifies the individual classification of its claim.

Although the separate classification of Breed may result in an accepting class of impaired unsecured creditors that would not exist were Breed included in the general unsecured creditors class, that fact alone does not condemn the Debtor's Plan. The question is whether the separate classification of the dissenting claimant is justified. In this case, where the Debtor's plan is premised upon imposing on Breed its obligations under the Termination Agreement, a reasonable basis for the Debtor's scheme of classification exists. The Termination Agreement is unique to Breed alone, and reference to the Debtor's rights under it is essential to the Plan because it represents the Debtor's main source of funding. Abiding by the Termination Agreement necessarily requires Breed to be treated differently than other creditors, thus providing the grounds for separately classifying Breed's claim.

The classification scheme proposed by the Debtor compares favorably with that approved by the court in *In re Jersey City Medical Center,* 817 F.2d 1055 (3d Cir.1987). The debtor in *Jersey City* separately classified several types of creditors based on the nature of their claims and their treatment under the plan. *Id.* at 1057–58. One class consisted of physicians whose claims arose out of agreements with the debtor for indemnification against malpractice awards. *Id.* at 1057. This class was scheduled to receive full payment under the plan from a third party insurance carrier. *Id.* A second class consisted of malpractice claimants who were going to receive payment of thirty (30%) percent of their claims from the same third party insurer. *Id.* A third class consisted of employee benefit plan non-priority claimants, and a fourth was composed of general unsecured creditors. *Id.* Both of the latter classes were designated to share in pro rata distributions from certain other identifiable funding sources. *Id.* Upon review, the Court stated that it was reasonable for the debtor's plan to distinguish between these creditors. *Id.* at 1061. Thus, the court found it to be inherently reasonable to categorize creditors in a plan based upon the nature and origins of their claims and the manner in which they will be paid. *Id.*

In the instant case, the Debtor has done the same thing. It separated Breed's claim from those of other creditors because of the unique nature of its claim based on the Ter-

mination Agreement and because of the distinct treatment Breed's claim necessarily has to receive under the Plan. *Cf. In re Bugg,* 172 B.R. 781, 783–84 (E.D.Pa.1994) (secured creditors with secured interests in distinct properties must be classified separately).

Having determined that Breed may be classified separately from general unsecured creditors, it is unnecessary for us to address the second prong of Breed's argument, *i.e.,* its accurate assertion that Soble and the Partnership are insiders. All of the other Class C creditors have accepted the Plan. Accordingly, even if Soble and the Partnership are insiders, the impaired class of general unsecured creditors has voted to accept the Plan, thus satisfying 11 U.S.C. § 1129(a)(10).

2. *The Debtor's Plan Stands Enough of a Chance to Succeed on Its Own Terms That It May Be Deemed Feasible Pursuant to the Scope of 11 U.S.C. § 1129(a)(11).*

■ Satisfaction of 11 U.S.C. § 1129(a)(11) requires a finding that, "[c]onfirmation of the plan is not likely to be followed by the liquidation, or need for further financial reorganization, of the debtor ... unless such liquidation or reorganization is proposed in the plan." The essence of this requirement is that the debtor's plan must be feasible, *i.e.,* that it should be reasonably likely of succeeding on its own terms without a need for further reorganization on the debtor's part. However, it is not necessary for plan success to be guaranteed, nor is the feasibility requirement generally viewed as rigorous. *See In re United Chemical Technologies, Inc.,* 196 B.R. 716, 721 (Bankr. E.D.Pa.) ("*United Chemical I*"), *aff'd in part & rev'd & remanded in part on other grounds,* 202 B.R. 33 (E.D.Pa.1996) ("*United Chemical II*").

The relevant caselaw has established a number of factors which bankruptcy courts should consider when ruling on a plan's feasibility, including: (1) the adequacy of the debtor's capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other factor which may be determinative of the prospects of a sufficiently successful operation to enable performance under the plan. *Id.* Several of these criteria are geared to reorganizations of conventional, on-going business operations and may not be relevant to the instant case, which is basically a liquidation. We shall, nevertheless, consider the above factors in our feasibility analysis.

The first factor does not weigh in the Debtor's favor. For all practical purposes, the Debtor has no present capital structure. Since the Debtor does not have an on-going operation, however, this factor is not as significant to the Debtor's success as it would be if it were. Principally, the Debtor was obliged to demonstrate that it had access to funds sufficient to finance the proposed litigation against Breed. Even though the Debtor expressed hope of finding an attorney willing to take its case on a contingency basis, it has realistically determined that it will need funding to proceed with the case. Even under a contingency fee arrangement, counsel is likely to require the Debtor to advance the costs of litigation. Also, the Debtor may be required to transport and sustain witnesses in Florida, the most likely sight of the trial. The Plan therefore contemplated that the Debtor would have access to capital sufficient for it to litigate against Breed effectively, provided of course that Breed sold the requisite number of air bags to make the case worthwhile.

The factor of the earning power of the Debtor's "business," though contingent at this point, appears favorable to the Debtor. DePhillipo hypothesized that 2,200 Midas shops selling just one air bag per month over a year's time would generate royalties in the range of $792,000. At this rate of income, the Debtor would be able to pay all of its creditors in full in less then a year and a half, and within three years, the Debtor would be in line to earn a substantial profit. Thus, if Breed ever reached an agreement with Midas and began selling any substantial quantity of air bags, the settlement value of the Debtor's claims against Breed alone would be considerable.

We disagree with Breed's assertion that the Debtor's foregoing projections are completely speculative or conjectural. To the contrary, if an agreement can be reached with an outlet such as Midas, and it appears that such an agreement has been discussed with Midas and is attainable, a projection based on selling one air bag a month at each location appears conservative.

Of course, the major drawback connected with the Debtor's projections is the contingency of Breed's entering into an agreement with Midas or otherwise establishing a system for mass marketing of the air bags. No matter how marketable a retrofitted air bag product may appear to be, Breed will have no way of selling it without establishing a retail marketing network.

As long as Breed is moving forward with the air bag program allegedly originally as envisioned by the Debtor, however, we are not inclined to rule out the possibility that this contingency will be fulfilled, so as to preclude the Debtor from proceeding with the Plan. The contingency of poor sales is already accounted for in the Termination Agreement, since that Agreement recognizes Breed's right to unilaterally discontinue the program. Moreover, the Termination Agreement itself expressly states that the parties will negotiate other payment arrangements if any of the assumptions upon which it is based, e.g., the success of the air bag project, do not come to fruition. By imposing the Termination Agreement on Breed, the Plan exposes Breed to no more risk than it otherwise faces.

Furthermore, Breed has no other avenue for receiving payment from the Debtor other than through the royalties provided in the Termination Agreement. The Debtor's debt to Breed is not backed by other collateral or guaranteed by a source other than Breed's setoff rights referenced herein. The Debtor is not operating or generating revenues. Breed will either be paid from the royalties, or it will not be paid at all. Breed's desire to shed the Termination Agreement supports, if anything, the Debtor's belief that Breed considers it important to eliminate the claims of the Debtor based on the Termination Agreement and keep all of the royalties for itself.

The Debtor's exposure of such a motive on Breed's part arguably demonstrates that Breed itself believes it will be selling a substantial number of the air bags in the foreseeable future.

The third factor, relating to the consistency of the Debtor's projections with the nation's economic conditions, appears to be primarily neutral in reference to the Debtor's plan. Neither party has made a showing that there is anything in the present economic climate that would either enhance or negate the Plan's prospect for success. The underlying concept of selling air bags to owners of vehicles not equipped for same appears topical. DePhillipo described a significant interest of the United States military in the project, and he observed that promotion of vehicular highway safety is an idea which should sell. That observation, though it seems intuitively true, is counterbalanced by the limited mass market life time for the product, i.e., most new cars have driver's-side air bags built in to them.

The ability of the Debtor's management to carry out the Plan appears adequate. Breed does not make any contrary argument in its brief. Based on their familiarity with the case and consequent importance as witnesses in a law suit, present management's anticipated continued involvement with the Debtor counts as a factor in the Debtor's favor.

In its arguments against feasibility, Breed insists that the speculative nature of bringing and winning a lawsuit, combined with questionable history to date of selling the product, renders the Plan infeasible. Breed is correct in pointing out that there are definite contingencies in the Debtor's Plan, but we conclude that the Plan nevertheless meets the minimal requirement of presenting a workable scheme of organization with a reasonable chance of success. Specifically, the Debtor's claim against Breed appears to have a substantial potential to succeed if and when such a case comes to trial. In actuality, the single largest variable to the success of the Plan may be Breed's ability to mass market its own product, rather than the Debtor's capability of bringing a lawsuit.

Contrary to Breed's contention, the Debtor's position is not comparable to that of the debtor in *In re Calvanese*, 169 B.R. 104 (Bankr.E.D.Pa.1994). In that case, we found the debtor's plan to lack feasibility because it was based on accomplishing a task, the sale of the debtor's house, on which the debtor had a track record of failure. Also, the task was complicated by the debtor's desire to continue to reside in the home for some period of time and the likelihood that the debtor would attempt to hold onto the property during any subsequent foreclosure action. *Id.* at 108–09. Breed will not lose any enforcement rights against collateral if the Plan is confirmed because it has no collateral. By contrast, the instant case involves the marketing of a promising new product and the litigation of a law suit that has some significant potential. We find that both of these undertakings have reasonable prospects for success, and we note that neither venture has yet met with failure.

The instant case is also distinct from *In re Ames*, 973 F.2d 849 (10th Cir.1992), *cert. denied sub nom. Ames v. Sundance State Bank*, 507 U.S. 912, 113 S.Ct. 1261, 122 L.Ed.2d 658 (1993); and *In re Cherry*, 84 B.R. 134 (Bankr.N.D.Ill.1988), also cited by Breed. Unlike the debtor in *Ames*, the Debtor is not hoping to delay a secured creditor by pursuing a doubtful lender liability action against that creditor toward the end of negating that creditor's secured claim. 973 F.2d at 851. Rather, the secured claim of Breed will be realized only through the income generated from the sale of air bags. The Debtor, therefore, is not attempting to diminish, negate or deny Breed's collateral, but is merely attempting to litigate its rights against Breed while preserving whatever security interests Breed has.

In *Cherry* the court denied confirmation of the debtor's plan because it did not believe that the debtor's personal injury action, from which the debtor proposed to partially fund its plan, had reasonable prospect of success. In so holding the court emphasized that the debtor's own personal injury lawyer admitted that there were serious questions about liability. 84 B.R. at 138. Here, however, we have seen enough evidence relevant to the parties' claims to ascertain that the Debtor has at least a reasonable chance to vindicate its rights against Breed. Therefore, we do not have "serious questions" regarding liability. As long as a lawsuit has a reasonable chance of success, depending on it for funding is no more or less contingent than depending on sales projections or other more traditional indicia of business success. *Compare United Chemical I*, 196 B.R. at 721; and *United Chemical II*, 202 B.R. at 45–46. In either case the projections are in essence educated guesses at predicting the future.

In sum, we find that the Debtor's Plan satisfies the generally-lenient criteria connected with demonstrating feasibility under 11 U.S.C. § 1129(a)(11). The Debtor has presented a workable plan with a reasonable chance of success. Significantly, the Plan exposes Breed to no greater risk than it otherwise faced under the Termination Agreement in the first place.

### 3. *Breed's Other Objections to Confirmation Under 11 U.S.C. § 1129(a) Lack Merit.*

■ Breed's contention that the Plan is proposed in bad faith, in violation of § 1129(a)(3), is unsubstantiated. According to Breed, the Plan was not proposed in good faith because it is not feasible and is proposed for the purpose of forestalling litigation. As far as feasibility is concerned, we have already ruled that the Plan is feasible, thus deflating that component of Breed's argument. The fact that implementation of the Plan will delay litigation does not in and of itself constitute bad faith. The confirmation of most plans of reorganization eliminate or otherwise delay creditors' ability to litigate against debtors. Moreover, the instant Plan envisions a degree of success in the Debtor's vindication of its rights against Breed which are likely to be realized only in litigation. The Debtor is therefore unlikely to delay in pressing this litigation forward.

■ We have repeatedly held that bad faith is a narrow concept primarily implicating instances of serious debtor abuse or misconduct in the bankruptcy process itself. *See In re Landes*, 195 B.R. 855, 859 (Bankr. E.D.Pa.1996); and *In re Gathright*, 67 B.R.

384, 390 (Bankr.E.D.Pa.1986), *appeal dismissed,* 71 B.R. 343 (E.D.Pa.1987). Even under broader configurations, bad faith still involves a showing that the debtor is abusing the provisions, purpose, or spirit of the Bankruptcy Code. *In re Love,* 957 F.2d 1350, 1357 (7th Cir.1992), cited approvingly in *In re Lilley,* 91 F.3d 491, 496 (3d Cir.1996). In this instance, we can identify no aspect of the Debtor's Plan or conduct leading us to conclude that the Plan is proposed in bad faith. The Debtor has not engaged in any form of misconduct or committed any other action indicative of an abuse of the provisions, purpose, or spirit of the Code.

■ Breed's assertion that the Plan violates the "best interests of creditors" test set forth in § 1129(a)(7) is likewise unpersuasive. This test requires only that creditors receive at least as much as they would receive in a Chapter 7 liquidation under the terms of a plan. *See, e.g., United Chemical II,* 202 B.R. at 56. In this case, the inevitable result of liquidation under Chapter 7, without pursuit of litigation against Breed, would be for creditors to receive nothing. Other than the Debtor's rights against Breed under the Termination Agreement, which the Debtor or a Chapter 7 trustee would almost certainly have to litigate to enforce, the Debtor owns no property. Moreover, it is doubtful that a Chapter 7 trustee would engage Breed in litigation to build an estate for the payment of creditors without funding. Finally, even if this were the case, creditors would not receive more from a trustee in Chapter 7 than the full payment of their claims which the Debtor proposes to pay under its Plan. The Plan, then, indisputably satisfies the "best interest of creditors" test.

■ Breed's remaining objection under 11 U.S.C. § 1129(a) is that the Plan fails to make timely payments to administrative creditors, as required by 11 U.S.C. § 1129(a)(9)(A). The gist of this objection is that the Plan's extended effective date will result in these creditors' not being paid on a date proximate to confirmation. *See* page 581 n. 1 *supra.* We need not consider the substantive basis of this objection because Breed has no standing to raise it. Generally, it is only an aggrieved party, whose own interests are impacted by particular plan provisions, may object to those provisions at confirmation. *See In re Tascosa Petroleum Corp.,* 196 B.R. 856, 863 (D.Kan.1996); *In re B. Cohen & Sons Caterers, Inc.,* 124 B.R. 642, 647 (E.D.Pa.1991); *In re Orlando Investors, L.P.,* 103 B.R. 593, 596–97 (Bankr. E.D.Pa.1989); and *In re Johns–Manville Corp.,* 68 B.R. 618, 623–24 (Bankr.S.D.N.Y. 1986), *aff'd in part & rev'd in part,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom. Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2d Cir. 1988). Thus, a party cannot successfully object to plan provisions that have no effect on that party's rights and interests thereunder. A party may therefore not object to a plan raising rights that belong to third parties who are not objecting. *Orlando Investors, supra,* 103 B.R. at 596–97; and *Johns–Manville, supra,* 68 B.R. at 623–24.

Breed's rights are clearly not affected by the timing or manner of payment to administrative creditors. Any objection to plan provisions effecting the rights of administrative creditors is for such creditors, and them alone, to assert. Since no administrative creditors are objecting to confirmation in this case, the propriety of the plan provisions affecting them are not at issue. In any event, the only known administrative creditor is the debtor's counsel, who expressly consented to waiting to collect its fee in accordance with the Plan.

4. *The Plan Fails to Meet the Cramdown Requirements of 11 U.S.C. § 1129(b) Because It Does Not Provide Breed With the Present Value of Its Claim by the Effective Date, as Required If Breed Is Deemed a Secured Creditor; Nor Does It Infuse the Debtor with a Sufficient Capital Contribution, as Required If Breed Is Deemed an Unsecured Creditor.*

■ With respect to the application of 11 U.S.C. § 1129(b), the Debtor initially asserts that Breed is unimpaired and therefore Class D, consisting of Breed alone, should be deemed to be a class accepting the Plan. *See* 11 U.S.C. § 1126(f). Hence, the Debtor argues that the Plan is confirmable under § 1129(a) without resort to cramming down

Breed's claim pursuant to § 1129(b). The Debtor premises this argument on paragraph 4.3 of the Plan, which provides that "[t]he Allowed Claim of Breed will be paid in accordance with [the Termination Agreement]. Breed's contractual rights pursuant to [that] Agreement are unimpaired."

The Debtor's argument must fail, however, because it overlooks the impact of 11 U.S.C. § 1141(a), which will bind Breed to terms of the Plan following confirmation. The effect of binding Breed to the Plan will require Breed to accept payment of its claim in accordance with the Termination Agreement regardless of any valid defenses or causes of action which Breed has to invalidate that Agreement. Pursuant to 11 U.S.C. § 1124, a claim is impaired unless the Plan leaves intact the creditor's full "*legal, equitable* and contractual rights." 11 U.S.C. § 1124(1) (emphasis added). The Plan leaves intact Breed's contractual rights under a contract which Breed seeks to terminate. However, other rights Breed may possess against the Debtor, such as a legal and/or equitable right to have the Termination Agreement rescinded, would be eliminated under the Plan. *See also In re Temple Zion,* 125 B.R. 910, 919–20 (Bankr.E.D.Pa.1991) (any alteration to a creditor's rights, even improvement thereto, constitutes "impairment").

Accordingly, we cannot conclude that Breed's claim is unimpaired. Indeed, if its claim were unimpaired, the Plan might be of no benefit to the Debtor because Breed would be allowed to retain the right to continue its law suit to rescind the Termination Agreement. Therefore, the Debtor's Plan is not confirmable under § 1129(a) and must meet the additional confirmation requirements imposed by § 1129(b) to be confirmed.

Under § 1129(b) a plan may be "crammed down," or imposed on a dissenting class of creditors, if it satisfies the provisions of § 1129(a) other than § 1129(a)(8); and does not discriminate unfairly against, and is "fair and equitable" to, dissenting impaired classes. 11 U.S.C. § 1129(b)(1). With respect to secured claims, § 1129(b)(2)(A) provides that the condition of being "fair and equitable" includes the alternative requirements that (1) the creditor retain its security

interest and receives deferred cash payments equal to the present value of its allowed secured claim; (2) has its lien attach to the proceeds of property sold under the plan; or (3) receives something that would be the "indubitable equivalent" of its claim. 11 U.S.C. § 1129(b)(2)(A). *See generally United Chemical II,* 202 B.R. at 48–49. With respect to unsecured creditors, "fair and equitable" treatment calls for (1) such a creditor to receive property having a present value equal to the allowed amount of its claim; or (2) the plan must comply with the absolute priority rule and not distribute to, or otherwise provide for the receipt or retention of property by, any inferior class. 11 U.S.C. § 1129(b)(2)(B). The absolute priority rule applies to only unsecured claims. *See United Chemical II, supra,* at 53–55.

In its current form, whether Breed's claim is characterized as secured or unsecured, the Plan fails to satisfy either of the alternative applicable requirements. Assuming that Breed's claim is secured, the Plan must provide that Breed will be paid based on its setoff rights under the Termination Agreement. The Plan arguably purports to satisfy the requirement of § 1129(b)(2)(A)(i) by allowing Breed to retain its liens and making cash payments to Breed over time. There is no sale of asset contemplated, pursuant to § 1129(b)(2)(A)(ii). The Plan includes no provisions which purport to give Breed any property or rights as a substitute for the legal or equitable rights of which the Plan deprives it which could possibly constitute the "indubitable equivalent" of its "lost" rights, as required by § 1129(b)(2)(A)(iii).

In their briefing, neither party discusses the requirements of § 1129(b)(2)(A). Breed does discuss the issue of whether it will receive the "present value" of its claim, which is the equivalent of the § 1129(b)(2)(A)(i)(II) requirement, but it appears to do so only in the context of arguing that § 1129(b)(2)(B)(i), relating to unsecured claims, is not satisfied. The Debtor does not present any arguments tending to establish that the Plan satisfies any of the § 1129(b)(2)(A) alternative requirements.

The parties' presentations may reflect their presumption that Breed's claim is actu-

ally totally unsecured. Such a presumed proper classification of Breed's claim would be consistent with Breed's argument that it has an unsecured claim which must be included in Class C, and an effort to promote consistency may motivate Breed's failure to address § 1129(b)(2)(A). The Debtor's emphasis on the argument that, even if Breed were placed in Class C, it would nevertheless have sufficient votes to attain confirmation because the votes of Soble and the Partnership can be counted as votes of purported non-insiders, probably explains its failure to address § 1129(b)(2)(A).

■ However, we have already noted that we cannot accept the Debtor's argument that Soble and the Partnership are not insiders. *See* page 582 *supra.* Furthermore, the Plan does not place Breed in Class C, and we cannot confirm a yet unproposed plan which does so. Breed has filed its claim as at least partially secured, and the claim must be treated as such until an objection is filed to that classification and is sustained. Because of our duty to ascertain that the Plan meets all of the criteria for confirmation, *see In re Sacred Heart Hospital of Norristown,* 182 B.R. 413, 423 (Bankr.E.D.Pa.1995); and *In re Richard Buick, Inc.,* 126 B.R. 840, 846 (Bankr.E.D.Pa.1991), we are required to ascertain whether the Plan meets the criteria of § 1129(b)(2)(A), despite the failure of Breed to directly make the argument that this Code section is not satisfied.

Concluding that the Plan purports to satisfy both prongs of § 1129(b)(2)(A)(i), and does satisfy § 1129(b)(2)(A)(i)(I), we find that the Plan fails to satisfy the requirements of § 1129(b)(2)(A)(i)(II). In order to satisfy the latter Code section, the plan must provide Breed with the present value of its claim. Some payments to Breed on the Plan are to be deferred until after the effective date. Thus, the Plan must provide that Breed will be paid interest in compensation for the time value of its claim lost by any deferral in payments. *See United Chemical II,* 202 B.R. at 51.

Although not argued by either of the parties, a question is presented as to whether the Plan needs to pay interest to Breed to provide it with the present value of its claim

when the Plan does not, on its face, delay the receipt of payment beyond the time it would be due under the Termination Agreement. We conclude that payment to Breed is potentially being delayed because the imposition of the Termination Agreement upon Breed through the Plan, without allowing it to raise other defenses, deprives Breed of the ability to seek payment by other means. Because the terms of the Plan would, apparently, prevent Breed from suing the Debtor for rescission of the Termination Agreement, it would prevent Breed from pursuing other options to satisfy its debt. It is thus fair to conclude that Breed would be deprived of alternative means of asserting its rights against the Debtor that would otherwise be available to it and consequently that it would be delayed in its ability to seek payment by the terms of the Plan. Therefore, we find that it would be necessary for the Debtor to pay Breed interest in order to provide Breed with the present value of its claim, as required under the Bankruptcy Code.

The Plan, however, makes no provision for the payment of any interest to Breed at all. Therefore, it fails to give Breed deferred cash payments, or property, in an amount that would equal the present value of Breed's claim. Thus, in the alternative that Breed is found to have a valid secured claim to some extent, the Plan fails to satisfy § 1129(b)(2)(A)(i)(II).

■ As we previously noted, the parties, apparently assuming that Breed is in fact a totally unsecured creditor, both address the issue of whether the requirements of § 1129(b)(2)(B) are satisfied under the Plan. The Debtor implicitly acknowledges that one of the two alternative requirements of § 1129(b)(2)(B), *i.e.,* that all claims be paid in full, as set forth in § 1129(b)(2)(B)(i), is not satisfied. The Debtor directs its attention to arguing that the requirements of § 1129(b)(2)(B)(ii), *i.e.,* that no junior claimants will receive or retain any amount or interests in property under the Plan, are satisfied. Assuming *arguendo* that Breed had only an unsecured claim, its vote to reject the Plan triggers the application of § 1129(b)(2)(B)(ii), also known as the absolute priority rule, if the junior Class E credi-

tors, consisting of the Debtor's equity interest holders, retain any amount or interest in property in the Plan.

The Debtor argues that Class E claimants retain no interest as a result of the Plan. However, the Plan characterizes the equity security holders as retaining a "contingent" ownership interest in the Debtor, conditioned on the full payment of senior classes of claims. The Plan then further provides that equity holders will not partake in any distribution from the Debtor of any kind until full payment is made to the unsecured creditors. Regardless of how their interest is characterized, or whether they can receive any type of distribution, it is clear that the Plan provides for equity holders to retain property rights in the Debtor. The Plan contemplates that the prepetition equity holders will ·continue to control the Debtor following confirmation and direct its litigation strategy against Breed. Under these circumstances, the absolute priority rule is implicated. Old equity is retaining an ownership interest in the Debtor without the Plan's paying senior classes of creditors in full.

■ The Debtor's attempt to overcome the absolute priority rule with Plan terms providing that priority tax claims will be paid in the following manner:

> Prior to the Effective Date, the Debtor (by and through new value contributions by its equity holders) will make bi-annual payments to the Internal Revenue Service in the amount of $1,000,00 each through the Effective Date, beginning six months after the Confirmation Order has been entered as a Final Order. Said payments will be applied to the oldest tax obligations owed to the Internal Revenue Service.

■ The Debtor argues that the cash infusion from its equity holders under this Plan provision will supply "new value" from the equity holders sufficient to overcome the absolute priority rule. *See In re Haskell Dawes, Inc.,* 199 B.R. 867, 871–72 (Bankr. E.D.Pa.1996); *In re Wynnefield Manor Associates, L.P.,* 163 B.R. 53, 56 (Bankr.E.D.Pa. 1993); and *In re 222 Liberty Associates,* 108 B.R. 971, 983–85 (Bankr.E.D.Pa.1990). A contribution of new value sufficient to overcome the absolute priority rule must be (1)

necessary for the debtor's reorganization; (2) in the form of money or money's worth; (3) reasonably equivalent to the interest retained by the equity holders; (4) substantial; and (5) proffered by the equity holders at the outset of the plan, *i.e.,* up front. *See Haskell Dawes, supra,* 199 B.R. at 872; *In re Union Meeting Partners,* 165 B.R. 553, 570 (Bankr. E.D.Pa.1994), *aff'd,* C.A. No. 94–2419 (E.D.Pa. July 29, 1994), *aff'd,* 52 F.3d 317 (3d Cir.1995); *Wynnefield Manor, supra,* 163 B.R. at 56–59; and *222 Liberty, supra,* 108 B.R. at 984–85.

Although priority tax claims will inevitably have to be funded for the Plan to be confirmed, we find that the proposed cash infusion is not necessary to the reorganization in the sense that it will contribute what is essential for the Debtor to maintain its business. *See Wynnefield Manor, supra,* 163 B.R. at 58–59 (contribution offered for no apparent reason except to satisfy the absolute priority rule is not acceptable). Considering the large upside potential if the royalties are paid, the proposed contribution, which the Debtor quantifies as a total of $16,000, does not appear to be close to the value that the equity holders wish to retain. The Debtor provided no evidence that the equity holders are obliged to contribute an amount equivalent to what they retain, as was its burden. *See In re Capital Center Equities,* 144 B.R. 262, 269 (Bankr.E.D.Pa. 1992).

Furthermore, it can hardly be said that a mere $16,000 contribution, under any circumstances, is substantial. The *Wynnefield Manor* decision, 163 B.R. at 57, notes that "substantability," in the context of a small, closely-held entity such as the Debtor, further requires a showing that the payment represent the equity holders' best efforts and results in a contribution to a substantial return for creditors. *See also Capital Center Equities,* 144 B.R. at 269–70.

Moreover, our review of DePhillipo's testimony indicates that the contention that as much as $16,000 will actually be contributed by the Debtor's equity holders does not appear to be accurate. At the rate of $2,000 per year, the stock holders will contribute no

more than $8,000 between now and March 31, 2000, the deadline for the Plan's effective date. This amount is very small and has no in sense been proven to constitute the equity holders' best efforts.

Finally, since the payment of the cash will be in installments, the proposed infusion of capital does not take place "up front." *Compare Union Meeting Partners, supra,* 165 B.R. at 570 (partners' agreement to contribute $412,928 "as needed," in addition to a $200,000 contribution, does not satisfy the "up front" equivalent as to the $412,928). For all of these reasons, it is evident that the equity holders' proposed cash infusion does not satisfy the so-called "new value exception" to the absolute priority rule. Therefore, the Debtor's failure to satisfy § 1129(B)(2)(A)(ii) is manifested, and it is fatal to confirmation of the Plan.

As a result of the foregoing, we conclude, without reservation, that the Plan cannot be confirmed. Nor can its defects be cured by placing Breed in Class C, as the Debtor appears to suggest as a ready alternative. *See* page 582 *supra.*

Since this case was filed almost a year ago on October 6, 1995, and there has been no showing of complexities justifying a delay, we are reluctant to provide the Debtor with very substantial dispensations in further attempts at "reorganization." The Debtor is in fact in a liquidation as opposed to a reorganizational mode and this case could, in many aspects, just as well be proceeding in Chapter 7. This case certainly does not perpetuate the Chapter 11 public policy of allowing a business to continue operations. *Compare United Chemical I,* 196 B.R. at 721–22; and *In re Mayer Pollock Steel Corp.,* 174 B.R. 414, 423 (Bankr.E.D.Pa.1994). The marginal societal value likely to be achieved through confirmation of a plan is comparable to that referenced as virtually totally insignificant in *In re River Village Associates,* 161 B.R. 127, 143 (Bankr.E.D.Pa.1993), *aff'd,* 181 B.R. 795 (E.D.Pa.1995).

On the other hand, determining the correct classification and amount of Breed's claim could result in a scenario which would enable the Debtor to place Breed in a class in which its rejecting vote would be out-voted. This prospect justifies allowing the Debtor one more opportunity to achieve confirmation of a plan, after its objection to Breed's claim is totally resolved. The record necessary to effect this resolution is due to be made at a hearing of September 18, 1996, from which we will allow no further continuances. We will require any further amended plan to be filed, with an accompanying disclosure statement, no later than November 1, 1996. We caution the Debtor that it must be careful and conservative in fashioning this plan, because it will in all likelihood constitute its last chance to prepare a confirmable plan in this case.

## D. CONCLUSION

An order consistent with the conclusions reached in the course of this Opinion will be entered.

## ORDER

AND NOW, this 13th day of September, 1996, after a hearing of August 7, 1996, to consider confirmation of the Debtor's First Amended Plan of Reorganization ("the Plan"), in light of Objections of Breed Technologies, Inc. ("Breed") thereto, it is ORDERED AND DECREED as follows:

1. Confirmation of the Plan is DENIED.

2. With respect to the continued hearing of September 18, 1996, on the Debtor's Objection ("the Objection") to the proof of claim of Breed, Claim No. 12, in light of the potential importance of the resolution of the Objection to the Debtor's ability to formulate a further amended plan, the hearing on the Objection shall not be continued further beyond

WEDNESDAY, SEPTEMBER 18, 1996, at 9:30 A.M.

and shall be held in Bankruptcy Courtroom No. 4 (Room 3620), Third Floor, United States Court House, 601 Market Street, Philadelphia, PA 19106. Thus, *no further continuances will be granted* and the Objection must be tried on that date if it is not resolved. Counsel are attached for that hearing on that date.

3. Continued presence of this case in Chapter 11 is conditioned upon the filing of a further amended plan and an accompanying amended disclosure statement by the Debtor or any other interested party, in conformity with the accompanying Opinion, serving black-lined copies of same upon counsel appearing on the attached mailing list and the court in chambers, and notifying all interested parties of the filing of the amended disclosure statement, on or before November 1, 1996.

4. A hearing on the further amended disclosure statement and to determine whether this case should be immediately converted to a Chapter 7 case, is scheduled on

WEDNESDAY, NOVEMBER 27, 1996, AT 9:30 A.M.

and shall be held in Bankruptcy Courtroom No. 4 (Room 3620), Third Floor, United States Court House, 601 Market Street, Philadelphia, PA 19106.

5. The court does not anticipate allowing any further extensions to the Debtor to achieve confirmation of a plan. If a plan cannot ultimately be confirmed as a result of the Debtor's next effort, this court anticipates that it will forthwith convert this case to a Chapter 7 case.